[No. S136690. Nov. 13, 2006.]

TRB INVESTMENTS, INC., et al., Plaintiffs and Appellants, v.
FIREMAN'S FUND INSURANCE COMPANY, Defendant and Respondent.

COUNSEL

Law Office of Timothy L. Kleier, Timothy L. Kleier; Law Office of Mark A. Ginella and Mark A. Ginella for Plaintiffs and Appellants.

Law Office of Amy Bach, Amy Bach; Goldstein, Gellman, Melbostad, Gibson & Harris, Lee S. Harris; Fried & Epstein and Lee M. Epstein for United Policyholders as Amici Curiae on behalf of Plaintiffs and Appellants.

Hager & Dowling, Jeffery D. Lim, Jessica M. Johnson and John V. Hager for Defendant and Respondent.

OPINION

**MORENO, J.**—This case involves a property insurance policy that withdraws coverage for specified perils while the insured premises are vacant. The pertinent exclusion contains an exception stating that buildings "under construction" are not considered vacant. The question before us concerns whether the work being performed on the building at the time of the loss rendered the building "under construction" such that the vacancy exclusion does not apply.

Plaintiffs argue their efforts meant that the structure was "under construction" and therefore covered under the policy when a water heater or waterline ruptured and caused substantial damage to the property. Defendant insurer disagrees with this interpretation of the policy. The Court of Appeal affirmed a grant of summary judgment in favor of the insurer, determining that the word "construction," as utilized in the policy, "envisions the building of a new structure," which did not occur here.

 We reverse the Court of Appeal. As used in the insurance policy here, the word "construction" cannot reasonably be understood to be limited only to the erection of a new structure. Rather, the term contemplates all building endeavors, whether classified as new construction, renovations, or additions, which require the substantial and continuing presence of workers at the premises. This standard serves the purposes underlying the vacancy exclusion, which is premised upon the recognition that unoccupied properties face an increased risk of damage, whether from property-related crime such as theft or vandalism or from building damage or loss related to neglect. If, however, a construction project results in the continuous and substantial presence of workers on the property, then the underlying justifications for the

vacancy exclusion no longer exist, a point recognized by the inclusion of an "under construction" exception to the general vacancy exclusion.

Given the parties here were unaware of this standard when litigating defendant's summary judgment motion, they failed to elicit key facts that might have bearing on the issue of whether there was a substantial and continuing presence of workers at the building in the period prior to the claimed loss here. Since these facts are not present in the current record, we do not decide whether the activity here satisfies the standard we announce today. Rather, we remand the matter to permit either party to bring a new summary judgment motion based upon the proper standard.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 1999, plaintiffs TRB Investments, Inc., Fran Mar Co., Coldwater Farms, P&R Almond Orchards, Inc., Thomas-Cattani, Inc., and 1731 Chester Group procured a property insurance policy from defendant Fireman's Fund Insurance Company. As originally issued, this policy covered property located on California Avenue in Bakersfield, California. An amendatory endorsement was added to this policy upon its renewal in June 2000. This endorsement included a vacancy exclusion that provides as follows:

"8. Vacancy

"If loss or damage occurs to a building that has been vacant for more than 60 consecutive days prior to the occurrence of that loss or damage, we will:

"a. not pay for any loss or damage caused by:

"1. Vandalism;

"2. Sprinkler leakage, unless you have protected the system against freezing;

"3. Building glass breakage;

"4. Water damage;

"5. Theft, or

"6. Attempted theft

"b. Reduce the amount we would otherwise pay for the loss or damage by 15%.

"A building is vacant when it does not contain enough business personal property to conduct customary operations.

"Buildings under construction are not considered vacant."

A cancellation endorsement added to the policy, meanwhile, provides that defendant may cancel the policy upon the occurrence of certain specified conditions, one of which is that "[t]he [insured] building has been vacant or unoccupied 60 or more days." This cancellation provision does not apply to "[b]uildings in the course of construction, renovation or addition."

In November 2000, plaintiffs added to the policy the commercial property involved in this dispute, a former bank building located on Chester Avenue in Bakersfield. This property was rented to the Salvation Army beginning on December 1, 2000. This tenant left the premises at the end of 2000, and the building had no tenants after that point up through the time of the damage giving rise to the instant suit. The property lacked "enough business personal property to conduct customary operations" during this span. However, plaintiffs did retain an architectural firm and a general contractor to transform the building into a "leasable shell," in which many of the interior nonsupporting walls would be removed so that the space could be refashioned to suit a particular tenant's needs. In April 2001, plaintiffs began negotiations with Goodwill Industries for a long-term "build to suit" lease. By June 20, 2001, plaintiffs, the contractor, and the tenant agreed in principle to the terms of a lease and to initial floor plans. On or around July 2, 2001, Goodwill entered into a lease agreement for the property.

On June 11 and June 20, 2001, the contractor engaged in "walk throughs" of the building, on the latter date being joined by subcontractors involved with the project. Between June 20 and June 29, 2001, the electrical subcontractor removed the electrical main panel covers, traced the circuitry from these panels, took down the walls around two panels and the subpanels connected to these panels, removed unneeded circuits and floor boxes, removed exposed electrical lines, and turned on and tested the remaining circuits for demolition safety. From June 29 to July 14, 2001, the electrical subcontractor periodically continued to work at the building, tracing other circuit runs, reviewing subpanel locations and functionality, turning on and testing all of the electrical circuits, and assisting the heating, ventilation and air conditioning (HVAC) subcontractor in testing the building's HVAC units. Beginning on July 1, 2001, the HVAC subcontractor also tested, evacuated, and charged the refrigeration system, making several trips to the building to perform this work.

On the morning of Monday, July 16, 2001, workers discovered that a water heater or waterline on the third floor of the Chester Avenue building had burst, causing significant water damage. The line burst occurred sometime between July 14 and July 16, 2001. This damage notwithstanding, plaintiffs completed the planned improvements to the structure in the ensuing months. This work was substantial. The project entailed the "overall complete demolition of [the] structure to shell walls" and the development of a "core space" within the building. The specific changes made to the structure included the installation of "walls, doors, windows, electrical, telephone, and computer wiring, plumbing, HVAC, paint, coverings," and additional restrooms, and the transformation of a basement into classroom space and old bank vaults into usable office space. All told, these improvements cost plaintiffs $1,250,881.09.

Plaintiffs tendered their water damage claim to defendant pursuant to the policy, which had been renewed again in June 2001. On December 7, 2001, defendant denied plaintiffs' claim. After attempts to reach an informal resolution of the dispute failed, plaintiffs filed this lawsuit on May 21, 2003. Defendant, pointing to the vacancy exclusion in the policy, moved for and received summary judgment in its favor. Plaintiffs filed a timely appeal. The Court of Appeal agreed with the superior court, finding that the vacancy exclusion applied and that the premises were not "under construction" at the time of the loss. The Court of Appeal assumed that the work being performed by plaintiffs at the time of the water damage constituted renovations to the building, but concluded that "under construction" did not encompass renovations to an existing structure.

The Court of Appeal offered five justifications for its interpretation of the pertinent policy language. First, the Court of Appeal stated that "the plain meaning of the word construction, in its ordinary and popular sense, does not include steps taken to renovate an existing building." Here, the Court of Appeal cited to dictionaries defining "construction" as " 'the act of putting parts together to form a complete integrated object,' " and " 'the creation of something new, as distinguished from the repair or improvement of something already existing,' " and defining renovation as " 'restor[ing] to life, vigor or activity,' " and " 'clean[ing] up, replac[ing] worn and broken parts in, [and] repair[ing].' " The Court of Appeal concluded from these definitions that construction "envisions the building of a new structure and requires the putting together of various parts in order to bring the building to a point of readiness for occupancy." In contrast, "A building under renovation is readily able to be occupied but requires some repair and improvements in order to meet the aesthetic or business needs of the occupant." Surveying the work

commenced prior to the loss, the Court of Appeal regarded these efforts as mere renovations, insufficient to render the building incapable of occupation.

Second, the Court of Appeal explained that "there is no evidence that the parties gave a different meaning to the term 'construction' so that renovations would be included." Third, the Court of Appeal noted that " '[b]uildings in the course of construction, renovation, or addition' " are excluded from the cancellation endorsement attached to the policy. From this language, the Court of Appeal concluded that "if the policy had wanted to include renovations as an exception to the vacancy exclusion, it would have said so." Fourth, the Court of Appeal stated that its interpretation of "construction" was consistent with the purpose of a vacancy exclusion "to prevent vandalism and ensure the prompt discovery of damage." The Court of Appeal surmised, "[b]uildings under construction will usually have workers on the property on a daily basis, which deters potential vandals and encourages the early discovery of fire or water damage. Renovation, however, does not require daily involvement with the property." Fifth and finally, the Court of Appeal pointed to decisions from other jurisdictions interpreting the word "construction," in the context of property insurance policies, as not including repairs or renovations.

We granted review.

## II. DISCUSSION

Plaintiffs argue that a building is "under construction" while it is being renovated, and assert that the work being performed on the premises involved here when the water damage occurred constituted "construction" under this interpretation of the policy language. The Court of Appeal disagreed, determining that "under construction," as used in the policy, "envisions the building of a new structure." The Court of Appeal did not specify whether work on an existing building could ever bring about a "new structure" under this interpretation. According to the Court of Appeal, however, "construction" does not include renovation, and therefore the vacancy exclusion applies against the insureds in this case. We apply de novo review to this question of policy interpretation. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385].)

The proper interpretation of the "under construction" clause poses an issue of first impression in the courts of this state. Other courts faced with construing insurance policies have arrived at different interpretations of this or similar language. It has been held in some quarters that the word

"construction" does not encompass repairs, renovations, and comparable work on an existing building. (See *Myers v. Merrimack Mut. Fire Ins. Co.* (7th Cir. 1986) 788 F.2d 468, 472 [interpreting vacancy exclusion clarifying that buildings " 'in process of construction' " are not regarded as vacant]; *Travelers Indemnity Company v. Wilkes County* (1960) 102 Ga.App. 362 [116 S.E.2d 314, 317] [construing policy exclusion applicable to buildings "in the process of construction"]; *Jerry v. Kentucky Cent. Ins. Co.* (Tex.App. 1992) 836 S.W.2d 812, 814–816 [interpreting policy language providing that "a building in the course of construction" is not considered vacant].) Other courts have determined that "construction" includes renovations to an existing structure. (*Brouillette v. Phoenix Assur. Co.* (La.Ct.App. 1976) 340 So.2d 667, 670–671; *Warren Davis Prop. v. United Fire & Cas.* (Mo.Ct.App. 2003) 111 S.W.3d 515, 522.) None of the preceding opinions, however, engaged in the sort of thorough examination of the policy language undertaken by the Court of Appeal below.

■ Well-established interpretive rules guide our own review of the vacancy exclusion and its "under construction" clause. "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. [Citation.] 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)" [Citations.] ■ A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' [Citation.] [¶] ■ Moreover, insurance coverage is ' " 'interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted narrowly against the insurer.' " ' [Citation.]" (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647–648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) "As a coverage provision, [an] exception [to an exclusion] will be construed broadly in favor of the insured. [Citations.] This broad construction will aid the insured in meeting its burden of proof, thereby ensuring that the end result (coverage or noncoverage) conforms to

the insured's objectively reasonable expectations." (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1192 [77 Cal.Rptr.2d 537, 959 P.2d 1213].)

■ As did the Court of Appeal, we begin our analysis by examining the "under construction" language at issue here to ascertain its common meaning. "Under" means "receiving or undergoing the action or effect of." (Webster's Collegiate Dict. (11th ed. 2003) p. 1363.) "Construction" means "the act of putting parts together to form a complete integrated object" (Webster's 3d New Internat. Dict. (2002) p. 489); "[t]he creation of something new, as distinguished from the repair or improvement of something already existing" (Black's Law Dict. (6th ed. 1990) p. 312); "[t]he act of building by combining or arranging parts or elements" (Black's Law Dict. (8th ed. 2004) p. 332); and "[t]he action of framing, devising, or forming, by the putting together of parts; erection, building" (3 Oxford English Dict. (2d ed. 1989) p. 794). As the Court of Appeal observed, there is no doubt that the term "construction," as commonly understood, includes the building of a new structure. Contrary to that court's suggestion, however, the "plain meaning" of that term would not seem to exclude other types of building endeavors short of erecting a new structure, such as substantial improvements or modifications to an existing structure, including projects that transform a hovel into a mansion, raze and replace the entire interior of a structure, or otherwise fundamentally transform a building. Under certain circumstances, such endeavors may be seen as comprising an "act of putting parts together to form a complete integrated object" or "building by combining or arranging parts or elements" as much as the erection of a new structure.

Indeed, the Legislature, in defining the term "construction" in various contexts, has recognized that the term may have a broad meaning encompassing a spectrum of building endeavors. For example, the Legislature has defined the "construction" of state buildings as "includ[ing] the extension, enlargement, repair, renovation, restoration, improvement, furnishing, and equipping of any public building." (Gov. Code., § 15802, subd. (b); see also *id.*, § 53800, subd. (d) [providing an identical definition of "construction"].) Certain administrative regulations likewise define "construction" as including substantial renovation, repair, or alteration efforts. (Cal. Code Regs., tit. 2, § 8102 [defining "construction" as "the process of building, altering, repairing, improving, or demolishing any public structure or building . . . . It does not include the routine operation, routine repair, or routine maintenance of existing structures, buildings, or real property"]; Cal. Code Regs., tit. 5, § 57152 [defining "construction project" as "includ[ing] new construction, alteration, and extension or betterment of existing structures"]; Cal. Code

Regs., tit. 8, § 11160 [defining "construction occupations" as "all job classifications associated with construction, including but not limited to, work involving alteration, demolition, building, excavation, renovation, remodeling, maintenance, improvement, and repair work"].) These definitions suggest that laypersons do not limit the phrase "under construction" to the erection of completely new buildings.

Notwithstanding that the term "construction" in ordinary parlance may include building projects short of the erection of a new structure, defendant argues the cancellation endorsement found in the policy defines that term narrowly. As discussed, that endorsement allowed defendant to cancel the insurance policy if the building "has been vacant or unoccupied 60 or more days" but not if the building was "in the course of construction, renovation or addition." Defendant argues this provision signifies that the term "construction" was meant to exclude "renovation or addition." The Court of Appeal agreed, reasoning that "[t]his is evidence that [defendant] considered renovations and additions to be distinct from construction and expressly chose not to except these circumstances from the vacancy exclusion."

The Court of Appeal's interpretation of the insurance contract here would lead to an anomalous result. Under such interpretation, if the insured conducted a "renovation" of the building and a specified loss occurred during the renovation, then the insurer would not be obligated to pay under the vacancy exclusion since the "under construction" exception would not apply. At the same time, however, the insurer would not have the power to cancel the policy since the cancellation endorsement excludes "renovation[s]." This interpretation, which binds an insurer to a contract in which it is not obligated to provide coverage for lack of occupancy, makes little sense. There would appear no principled reason why, if vacancy for purposes of renovation violates a provision of the insurance contract such that the insurer need not provide coverage, then the insurer should not also be empowered to cancel the contract based upon the same violation of the contract terms.

We believe the more reasonable interpretation is that the term "under construction" as used in the vacancy exclusion was meant to be the functional equivalent of "construction, renovation or addition" as used in the cancellation endorsement, i.e., the latter provides a more detailed gloss on the former. It has been recognized that vacant buildings face an increased risk of property crime, including vandalism, as well as property damage arising from neglect or disrepair. (See *Belgrade v. National American Ins. Co.* (1962) 204 Cal.App.2d 44, 47 [22 Cal.Rptr. 21]; *Myers v. Merrimack Mut. Fire Ins. Co.*, *supra*, 788 F.2d at p. 472.) Thus, both the vacancy exclusion and the cancellation endorsement serve to protect the insurer against the increased risks of loss that occur when premises are unoccupied for an extended period

of time. Likewise, the construction exception to the vacancy exclusion serves the same function as the construction exception in the cancellation endorsement. If a building is regularly occupied during normal business hours, as is usually contemplated for commercial structures, then an insurer can assess risk based upon such occupancy. When there is substantial construction activity on the premises, the risk of loss becomes roughly equivalent to that of an occupied building, thus giving the insurer the benefit of its prior risk assessment.

■ The Court of Appeal's focus upon whether the term "under construction" encompasses only the erection of new structures or also includes renovations thus fails to take into account the rationales underlying the vacancy exclusion and the construction exception. We believe the proper inquiry for determining whether a building is "under construction" for purposes of defining an exception to the vacancy exclusion is whether the building project, however characterized, results in "substantial continuing activities" by persons associated with the project at the premises during the relevant time period. (*Will Realty Corp. v. Transp. Ins. Co.* (1986) 22 Mass.App.Ct. 918 [492 N.E.2d 372, 373]; see also *Vennemann v. Badger Mut. Ins. Co.* (8th Cir. 2003) 334 F.3d 772, 774.) Under that test, "sporadic entry" (*Will Realty, supra,* 492 N.E.2d at p. 373) would be insufficient to find a substantial continuing presence of workers required for a finding of "construction." (See *Vennemann, supra,* 334 F.3d at p. 774 [construction project insufficient to fall within construction exception to vacancy exclusion].) We believe this test better serves the purposes underlying the vacancy exclusion and more accurately reflects the reasonable expectations of an insured than any test turning upon technical distinctions between "construction" on one hand and "renovation" or "remodeling" on the other.

Defendant contends the building here was not "under construction" because, at the time of the loss, contractors were engaged in only "preparatory" activities in contemplation of *future* construction. The characterization of the activities here as "preparatory" is no more helpful than characterizing the building endeavor as a "renovation" or "remodeling." Whether the construction activity at issue is performed in contemplation of, or in preparation for, a building endeavor of even greater scope involving more workers is beside the point. The question remains the same no matter what stage of a construction project is at issue, i.e., are there "substantial continuing activities" on the premises by those involved in the construction endeavor? (*Will Realty Corp. v. Transp. Ins. Co., supra,* 492 N.E.2d at p. 373.)

As noted above, we normally " ' "apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy."

[Citations.] . . .' " (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 414 [33 Cal.Rptr.3d 583, 118 P.3d 607].) Therefore, we would ordinarily determine whether the circumstances here constituted "construction" for purposes of finding coverage. It is true that there is no dispute regarding the facts elicited by the parties here. However, since they were unaware of the standard we adopt today, the parties did not elicit key facts which might have a bearing on the relevant inquiry, i.e., whether the construction project here was such that there were substantial continuing activities on the premises during the relevant period (here, within 60 days prior to the loss). The record reflects that electrical and HVAC subcontractors engaged in various activities at the building, and that various other personnel, such as the contractor and the architect, also spent time there in the weeks prior to the loss at issue. But, the record does not disclose the number of people associated with the construction project, how many hours per day or days per week they were in the building, and how much of the building was occupied by these persons at any given time. Those and similar facts would be needed to determine whether there was a substantial continuing presence of construction personnel.

The version of facts presented by defendant in support of the summary judgment motion seemed to suggest that only a handful of workers were at the premises at any given time to perform minor tasks and the presence of workers was sporadic at best, although the facts presented focused more on *what* was being done rather than on the number of workers and time spent doing them. If shown, such sporadic entry would render summary judgment for defendant appropriate. On the other hand, plaintiffs' version of facts presented in opposition to the summary judgment motion seemed to suggest that the presence of workers was more or less continuous during business hours prior to the loss, though the facts alleged were vague as to the scope of their presence. Such facts, if established, might render summary judgment for plaintiffs appropriate. Or, it might be the case that a genuine factual dispute exists on these points, which would preclude summary judgment for either party. Thus, whether the loss here should be covered under the policy would seem a close issue which cannot be resolved on the facts currently before us.

We therefore reverse the Court of Appeal's judgment affirming the trial court's grant of summary judgment for defendant. We remand to the Court of Appeal with directions to remand the matter to the trial court to permit either party to file a new summary judgment motion. (See *General Star Indemnity Co. v. Superior Court* (1996) 47 Cal.App.4th 1586, 1592–1595 [55 Cal.Rptr.2d 322]; *Redwood Theatres, Inc. v. Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687, 713–714 [248 Cal.Rptr. 189].) This will allow the parties to present factual allegations germane to the standard we have outlined above.

### III. Disposition

The judgment of the Court of Appeal is reversed. The matter is remanded to the Court of Appeal with directions to reverse the order granting summary judgment and to remand the matter to the trial court for proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.