[No. B198340. Second Dist., Div. Five. Aug. 29, 2008.]

PAMELA SPANGLE, Plaintiff and Appellant, v.
FARMERS INSURANCE EXCHANGE et al., Defendants and Respondents.

---

### COUNSEL

Shernoff Bidart & Darras, Michael J. Bidart, Ricardo Echeverria; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Gordon & Rees, Peter Schwartz and David L. Jones for Defendants and Respondents.

---

### OPINION

### MOSK, J.—

## INTRODUCTION

Anthony McCarty purchased a used Chevrolet Blazer for his 16-year-old son, Kevin,[1] from Triple Crown Auto Sales, Inc. (Triple Crown). Approximately one week later, Kevin was driving the Blazer when he collided with and seriously injured plaintiff and appellant Pamela Spangle (plaintiff). Plaintiff obtained a judgment against Kevin far in excess of the insurance covering him. Plaintiff now seeks to recover against a "garage operations" liability policy issued to Triple Crown by defendant and respondent Mid-Century Insurance Company (Mid-Century).[2] Plaintiff's theory is that, because Triple Crown incorrectly filled out the Department of Motor Vehicles (DMV) paperwork, title never transferred to Kevin, Triple Crown was still an owner of the Blazer when the accident occurred, and therefore Kevin was insured as a permissive user of the Blazer under Mid-Century's policy.

This opinion concludes that (1) there are triable issues of material fact regarding title to the automobile and consequently whether Kevin was a permissive user of the automobile; and (2) it cannot be established as a matter of law that Kevin was not covered by the policy if he was a permissive user. The summary judgment against plaintiff is reversed.

---

[1] Reference to Kevin and Anthony McCarty by their first names is to distinguish each from the other.

[2] Mid-Century is affiliated with the other defendants, Farmers Insurance Exchange and Fire Insurance Exchange.

## BACKGROUND[3]

In June 2000, Kevin lived in Oregon with his mother and stepfather. He flew to California to visit his father, Anthony. On June 28, Anthony purchased from Triple Crown a used Chevrolet Blazer automobile for Kevin, paying the full purchase price in cash. Triple Crown required Anthony to sign the purchase agreement because Triple Crown had a policy of not entering into purchase agreements for automobiles with minors. Although a minor, Kevin signed the DMV "Report of Sale—Used Vehicle" form as the purchaser of the Blazer. Kevin also executed the DMV power of attorney form authorizing Triple Crown to forward the necessary documentation to the DMV to transfer ownership of the Blazer. At the time, Triple Crown was insured under a commercial automobile and garage operations liability policy issued by Mid-Century.

On July 5, 2000, Kevin was driving the Blazer when he made a left turn into oncoming traffic. The Blazer collided with a car driven by plaintiff. Plaintiff was severely injured, and her passenger was killed. In October 2000, plaintiff sued Kevin and his family to recover for her personal injuries.

At the time of the accident, Kevin's mother and stepfather were insured by Progressive Classic Insurance Co. (Progressive). While plaintiff's suit against Kevin was pending, Progressive denied coverage for the accident and sought a judicial declaration from the United States District Court for the Eastern District of California (the Progressive action) that the Blazer was neither a "covered vehicle" nor a "non-owned vehicle" under the Progressive policy. On cross-motions for summary judgment, the district court concluded that the Blazer was a "non-owned vehicle" as defined in the Progressive policy because legal title had never passed from Triple Crown to Kevin pursuant to Vehicle Code section 5600. The court reasoned, it was undisputed that Anthony, not Kevin, was the actual purchaser of the vehicle. Triple Crown therefore should have transferred title to Anthony, who in turn could have transferred title to Kevin. Because Kevin was a minor, the power of

---

[3] Because this opinion relies solely on evidence submitted by Mid-Century (see fn. 5, *post*), the task of setting forth the facts has been hampered by Mid-Century's failure to comply with California Rules of Court, rule 8.204(a)(1)(C), which requires parties to "[s]upport any reference to a matter in the record by a citation *to the volume and page number of the record where the matter appears.*" (Italics added.) Mid-Century's statement in a footnote that the facts it relies upon may be "found in respondents' separate statement of undisputed facts" does not satisfy that requirement. "It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations. [Citations.] Briefs which do not meet this requirement may be stricken. [Citation.] As practical matter, the appellate court is unable to adequately evaluate *which facts* the parties believe support their position when nothing more than a block page reference is offered in the briefs . . . . The problem is especially acute when, as here, the appeal is taken from a summary judgment." (*Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 [277 Cal.Rptr. 401].)

attorney that Kevin had signed purporting to authorize Triple Crown to transfer title was void. The district court concluded that Kevin was therefore covered by the Progressive policy as a "relative" of his mother driving a "non-owned vehicle" with permission.

After the district court rendered its decision in the Progressive action, plaintiff made a claim against Triple Crown's policy with Mid-Century. Plaintiff asserted that Kevin was "insured" as a permissive user under the policy because, as legal title had never passed from Triple Crown to Kevin, Triple Crown was an "owner" of the Blazer at the time of the accident. Mid-Century rejected plaintiff's position, contending that Triple Crown was never the legal or registered owner of the Blazer,[4] and was not an equitable owner because Anthony had paid the full purchase price and taken possession of the vehicle. Furthermore, Kevin was not an "insured" because the policy excluded from the definition of "insureds" those "customers" of Triple Crown who had other insurance available.

In July 2004, plaintiff obtained a judgment against Kevin for $2.32 million. Plaintiff's attorney made a policy limits settlement demand of $1 million on Mid-Century. Mid-Century rejected the settlement demand, contending that regardless of whether Triple Crown might be deemed an "owner" of the Blazer at the time of the accident, Kevin and Anthony were excluded from coverage as "customers" of Triple Crown. Further, Mid-Century asserted that the accident did not "result[] from" Triple Crown's "garage operations" under the policy, reasoning that the coverage for "garage operations" applied only to the service and repair of automobiles. Along with used car sales, Mid-Century asserted, Triple Crown's business, for which the "garage operations" coverage applied, included " 'Complete Auto Service.' "

In plaintiff's first amended complaint against Mid-Century, she alleged claims for insurance bad faith and breach of contract, and a claim as a judgment creditor for direct recovery against a debtor's insurer, pursuant to Insurance Code section 11580, subdivision (b)(2). Plaintiff moved for summary adjudication of the coverage issues pursuant to Code of Civil Procedure section 437c, subdivision (f). Mid-Century cross-moved for summary judgment or, in the alternative, summary adjudication.

The trial court denied plaintiff's motion for summary adjudication[5] and granted Mid-Century's motion for summary judgment. The trial court granted

---

[4] According to Mid-Century's coverage counsel, when a used car dealer acquires a car as a trade-in, it is common for the dealer to take the registration certificate or "pink slip" from the customer but not change registration at that time. When the dealer later resells the car, it files a notice of sale with the DMV.

[5] The trial court sustained Mid-Century's objections to most of the evidence proffered by plaintiff both in support of her motion for summary adjudication and in opposition to

Mid-Century's motion on the basis that there was no relationship between Kevin's use of the Blazer at the time of the accident and Triple Crown's "garage operations," as defined in the policy; as a result, the accident did not "result[] from" Triple Crown's "garage operations" and was not covered. The trial court declined to grant summary judgment on the ground that Kevin was a "customer," concluding that the term "customer" was ambiguous when applied to a minor. The trial court also declined to grant summary judgment on the ground that Triple Crown was not an "owner" of the Blazer, concluding that Mid-Century had failed to meet its threshold burden of production on the issue. The trial court entered judgment in favor of Mid-Century. Plaintiff timely appealed.

## DISCUSSION

### A. *Standard of Review*

" 'When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.]' [Citation.] [¶] 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage. [Citation.] We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.' [Citations.]" *(Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589] *(Powerine).)*

■ The California Supreme Court set forth the rules governing the interpretation of insurance contracts in *Powerine, supra,* 37 Cal.4th 377. "In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts. . . . [¶] ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract."

Mid-Century's motion. Plaintiff does not contest the trial court's evidentiary rulings on appeal. This opinion therefore relied only on the evidence submitted by Mid-Century. Mid-Century's evidentiary submissions, however, largely duplicated plaintiff's, and Mid-Century used some of that evidence in its arguments to the trial court in ways to which it objected when done by plaintiff (for example, by relying upon judicially noticed documents—particularly the district court's memorandum decision in the Progressive action—to support the truth of evidentiary facts stated therein).

[Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [Citation.] [¶] ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " [Citation.] " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " [Citation.] "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]' [Citation.]" (*Powerine, supra,* 37 Cal.4th at pp. 390–391; accord, *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27 [50 Cal.Rptr.3d 597, 145 P.3d 472].)

### B. *"Garage Operations" Coverage*[6]

Mid-Century argues that the policy covers only liability "resulting" from the "ownership, maintenance [or] use of locations for garage business" or "the roads or other access that adjoin these locations." Because Kevin's accident occurred some 50 miles from Triple Crown's lot while Kevin was driving the Blazer for his own private purposes, Mid-Century contends, the accident did not "result[] from" Triple Crown's "garage operations." Mid-Century's argument is contrary to the plain text of the policy.

The relevant coverage provision in the policy states: "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from 'garage operations' involving the ownership, maintenance or use of covered 'autos.' " Stated otherwise, this coverage applies if (1) an insured (2) legally must pay damages because of bodily injury or property damage, when such damage (3) is caused by an accident that (4) results from " 'garage operations' involving the ownership, maintenance or use of covered 'autos.' "

It is assumed for purposes of this analysis in this part B. that Kevin was an "insured" under the policy. (See Discussion, pts. C. & D., *post.*) Mid-Century does not assert its alleged lack of ownership or that it legally transferred

---

[6] The trial court granted summary judgment on the ground that even if title in the automobile were such that Kevin was a permissive user—issues that the trial court said involved triable issues of fact—the policy was not applicable. Thus, we must address the coverage issues.

ownership to Kevin as grounds to affirm the judgment. Mid-Century only argues on appeal its interpretation of the policy language.

There is no dispute that Kevin was legally obligated to pay damages because of the bodily injury and property damage suffered by plaintiff—who obtained a judgment against Kevin in excess of $2 million—or that plaintiff's damages were caused by an accident. It is likewise undisputed that the Blazer was a "covered 'auto' " under section I of the coverage form, which defines "covered 'autos' " as "ANY 'AUTO.' "

Whether the policy potentially covers plaintiff's damage therefore turns on whether Kevin's accident *"result[ed] from 'garage operations' involving the ownership, maintenance or use of"* the Blazer. (Italics added.) To resolve that issue, we must determine what constitutes a "garage operation." The policy defines "garage operations" as follows: " 'Garage operations' means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. 'Garage operations' includes the ownership, maintenance or use of the 'autos' indicated in SECTION I of this Coverage Form as covered 'autos'. 'Garage operations' also include all operations necessary or incidental to a garage business."

The definition of "garage operations" consists of three sentences. The first sentence is a general statement that the term "garage operations" refers to the ownership, maintenance, or use of locations for a garage business.[7] The second and third sentences modify and clarify the general statement made in the first sentence. The second sentence states that garage operations include the ownership, maintenance or use of covered autos. The third sentence states that garage operations *also* include operations necessary or incidental to a garage business. It thus appears that although the second and third sentences both modify the first, they are distinct from and independent of one another.

The second sentence is particularly relevant here. That sentence expressly defines "garage operations" to include the "ownership, maintenance

[7] Mid-Century has asserted that the term "garage business" applied only to the service and repair of automobiles. The term "garage business" is generally understood, however, to include auto sales when a garage operations liability policy is purchased by an auto dealership. (See 5 Leitner et al., Law & Practice of Insurance Coverage Litigation (2008) § 55:1 (Leitner); 1 Cornblum, Cal. Ins. Law Dict. and Desk Reference (2008) § G6 [" 'Garage operations' as defined in a liability policy means the ownership, maintenance, or use of premises for the purpose of *an automobile dealer*, repair shop, service station, storage garage, or public parking, and all operations necessary or incidental thereto" (italics added)].) There is "garage-keepers" coverage, which is different than "garage operations" coverage. (See 5 Leitner, *supra*, § 55:45; *Atlantic Mutual Ins. Co. v. Travelers Ins. Co.* (1983) 147 Cal.App.3d 1054, 1057 [195 Cal.Rptr. 476].)

or use" of a "covered 'auto'." In other words, an insured's "use" of a "covered 'auto' "—defined in section I of the policy as "ANY 'AUTO' "—is itself a "garage operation," as defined in the policy. There is no additional requirement that the "use" of the "covered 'auto' " *also* be related to Triple Crown's business of selling or repairing motor vehicles. The policy's basic coverage provision thus encompasses liability for bodily injury or property damage incurred by an insured that is caused by an accident and that results from an insured's use of any auto.[8] Kevin's (an insured's) "use" of the Blazer (a covered auto) was thus, under the policy, a "garage operation."[9] Because the accident resulted from Kevin's use of the Blazer, plaintiff's bodily injuries fall within the basic coverage provision of the policy.

■ The best indicator of an insured's reasonable expectation of coverage is, of course, the language of the insurance policy. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co., supra,* 40 Cal.4th at p. 27 [parties' " 'intent is to be inferred, if possible, solely from the written provisions of the contract' "]; *Powerine, supra,* 37 Cal.4th at p. 391; *Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 [13 Cal.Rptr.3d 68, 89 P.3d 381].) "It is not our role to speculate on the policyholder's abstract expectations, but rather to consider reasonable expectations defined by the insurer's policy language. [Citation.] We must apply well-accepted rules of construction of insurance contracts to ascertain what reasonable expectations were created by the insurer in drafting its [policy]." (*Jauregui v. Mid-Century Ins. Co.* (1991) 1 Cal.App.4th 1544, 1552, fn. 1 [3 Cal.Rptr.2d 21].) The policy in this case reasonably can be read to afford coverage for liability arising from an insured's use of any automobile, whether that use was 50 miles or five blocks from Triple Crown's lot. Moreover, a dealership such as Triple Crown presumably needs insurance for such activities as test drives and customers driving onto the lot. There is no indication that Triple Crown had any liability policy other than the Mid-Century garage operations policy. For these reasons, Triple Crown objectively would have a reasonable expectation of coverage.

■ The interpretation of the "garage operations" provision is consistent with interpretations of similar policy provisions by commentators and courts in other jurisdictions. " '[T]he significant criterion for coverage under a garage operations policy *is whether the vehicle involved is an insured vehicle under the policy, and not the nature of its use when the accident occurred.*' " (*Arnold v. Beacon Ins. Co. of America* (Fla.Dist.Ct.App. 1996) 687 So.2d 843,

---

[8] This broad coverage provision is limited by other policy provisions not relevant here. For example, Triple Crown's employees are excluded from the definition of "insured" when driving a car owned by the employee or a member of his or her household.

[9] That a "garage operations" policy would cover the liability involved here does not appear to be unusual. (See fn. 7, *ante; p. 570, post.*)

845, italics added; accord, *Burr v. Nationwide Mut. Ins. Co.* (1987) 178 W.Va. 398 [359 S.E.2d 626, 630] (*Burr*); 5 Leitner, *supra*, § 55:14.) As stated in one leading treatise, "Usually, the policy by its terms insures against loss from liability imposed by law upon the insured for injury to person or damage to property as a result of accidents caused by or through the business of the insured upon the premises described in the policy, *or* outside such premises if caused by the insured or its employees engaged in the discharge of their duties in said business, *or caused by or through the ownership, maintenance, use, or operation of any automobile.* Thus, it has been formally recognized that garage liability policies ordinarily cover more hazards than most liability policies." (8A Couch on Insurance (2005) § 120.38, p. 120-51, italics added.)

■ As the foregoing authorities demonstrate, the general understanding of the term "garage operations" in the insurance context is contrary to the narrow interpretation advanced by Mid-Century in this case. As the court in *Burr, supra*, 359 S.E.2d 626, explained in rejecting an interpretation identical to Mid-Century's, "It seems clear that the definition of the term 'garage operations' includes three components of coverage. First, there is coverage for liability arising from 'the ownership, maintenance or use of the locations' utilized as the garage business. Second, there is coverage for the 'ownership, maintenance or use of the autos' specified in the policy as covered vehicles. Third, coverage is available for 'all operations necessary or incidental to a garage business.' [¶] [The insurer] appears to argue that the first coverage, involving the garage location, must also be deemed to form a limitation on the second coverage dealing with automobiles. It contends that to be covered the operation, maintenance, and use of an insured vehicle must be around the garage premises, or at least closely interwoven with some activity arising from the garage operation. *However, it seems clear to us that the second coverage deals generally with the ownership, maintenance, and use of the covered vehicles and is not narrowly confined to garage business uses.*" (*Id.* at p. 630, fns. omitted, italics added.) As the court in *Burr* noted, the insurer could have "include[d] a standard clause which limits the motor vehicle coverage to the 'ownership, maintenance or use of any automobile in connection with [garage] operations.' " (*Id.* at p. 630, fn. 8.) It did not in that case, and neither did Mid-Century in its policy at issue here. (See *Atlantic Mutual Ins. Co. v. Travelers Ins. Co., supra*, 147 Cal.App.3d at p. 1056 & fn. 1 ["garagekeepers" coverage limited to bodily injury arising out of " 'the ownership maintenance or use of the premises for the purposes described in the declarations and all operations necessary or incidental thereto' "].)

Mid-Century relies on *Miesen v. Bolich* (1960) 177 Cal.App.2d 145 [1 Cal.Rptr. 912] (*Miesen*) for the proposition that there must be a "link" between the accident causing injury and the policyholder's "garage operations." *Miesen* has no bearing on this case. In *Miesen*, the insured was a service station and repair shop that also rented a few pieces of equipment to

third parties using the same premises. A man rented a truck from the insured; he was injured when negligently maintained side rails failed while he was loading furniture into the truck. He fell backwards from the bed of the truck to the pavement. (*Id.* at pp. 148–149.) The issue was whether the insured's negligent maintenance of the truck was "necessary or incidental" to the insured's business. (*Id.* at p. 155.)

Unlike *Miesen, supra*, 177 Cal.App.2d 145, the coverage in this case does *not* arise from the policy's coverage for "all operations necessary or incidental to a garage business." As discussed above, that definition of "garage operations" is separate from and independent of the portion of the definition relevant here—that is, the definition of "garage operations" that includes the "use" of "covered 'autos' " by an "insured." In this case, the bodily injury to plaintiff was caused by an accident, and resulted from Kevin's use of the Blazer—by definition, a "garage operation," assuming Kevin otherwise qualifies as an "insured."

### C. *"Customer" Exclusion*

As a separate and alternative basis for affirming the summary judgment, Mid-Century asserts that Kevin was excluded from the definition of "insured" as a matter of law because he was a "customer" of Triple Crown with other insurance available to him in excess of the minimum required by California's financial responsibility laws. The trial court declined to grant summary adjudication of this issue, concluding that the term "customer" is ambiguous when applied to a minor for whom a vehicle is purchased by another. The evidence before the trial court at the summary judgment proceeding suggests that Kevin was not a "customer" as that term is used in the policy because he was not the purchaser or potential purchaser of the Blazer.

It is undisputed that Triple Crown was in the business of selling used cars, and that the policy's declarations page stated that Triple Crown's business was "used car sales." The policy excludes from the definition of "insureds," "Your customers, if your business is shown in the Declarations as an 'auto' dealership." This exclusion does not apply to customers who are uninsured or who carry insurance less than that required by the financial responsibility laws. (See Ins. Code, § 11580.1, subd. (d)(2); Veh. Code, § 16056, subd. (a); see also *Universal Underwriters Ins. Co. v. Gewirtz* (1971) 5 Cal.3d 246, 249 & fn. 2 [95 Cal.Rptr. 617, 486 P.2d 145]; *Tilley v. Truck Ins. Exchange* (1978) 84 Cal.App.3d 263, 265 & fn. 1 [148 Cal.Rptr. 520].) It is also undisputed that Kevin was covered by other insurance in excess of that required by the financial responsibility laws. Whether the exclusion applies thus turns on whether Kevin was a "customer" within the meaning of the policy.

The policy does not define the term "customer," and California authority has not addressed this specific insurance policy issue. We therefore look to the term's ordinary and popular meaning. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 471 [9 Cal.Rptr.3d 701, 84 P.3d 385].) Dictionary definitions of "customer"—with respect to the usage relevant here—consistently refer to a "purchaser" or "buyer." (See, e.g., Webster's 3d New Internat. Dict. (2002) p. 559, col. 3 ["One that purchases some commodity or service"]; Black's Law Dict. (5th ed. 1979) p. 348, col. 1 ["A buyer, purchaser, consumer or patron"]; Ballentine's Law Dict. (3d ed. 1969) p. 301, col. 1 ["In common usage, a person who buys the merchandise or engages the services of another person."].) It appears that courts in other states have concluded that one who purchases or who is a potential purchaser of a motor vehicle is a "customer" within the meaning of an auto dealership's garage operations liability policy. (See *Haro v. Universal Underwriters Ins. Co.* (Tex.Ct.App. 2005) 162 S.W.3d 661, 662–663; *Mutual Service Cas. Ins. v. West Bend Mut.* (Minn.Ct.App. 1999) 599 N.W.2d 585, 586–588; *General Acc. Ins. Co. of America v. Hughes* (Ind.Ct.App. 1999) 706 N.E.2d 208, 211; *American States Ins. Co. v. Hartford Cas. Ins. Co.* (C.D.Ill. 1997) 950 F.Supp. 885, 888; *Winn v. Becker* (1995) 163 Vt. 615 [660 A.2d 284, 285]; *Aubrey v. Harleysville Ins. Companies* (1995) 140 N.J. 397 [658 A.2d 1246, 1248–1249]; *Frontier Ford v. Carabba* (1987) 50 Wn.App. 210 [747 P.2d 1099, 1103]; cf. *Guient v. Timmons Intern., Inc.* (La.Ct.App. 1998) 722 So.2d 397, 398 [employee of purchaser not a "customer" when driving trade-in to dealership on behalf of employer after sale was completed].)

Courts have similarly defined "customer" in other contexts with reference to one who purchases good or services. (See, e.g., *Jim's Auto Body v. Commissioner of Motor Vehicles* (2008) 285 Conn. 794 [942 A.2d 305, 315, 318] [construing statutory phrase " 'customers of dealers and repairers' " (italics omitted) consistent with common usage to mean one who "furnishes payment for the repair of a vehicle"]; *Graebel/Houston Movers, Inc. v. Chastain* (Tex.Ct.App. 2000) 26 S.W.3d 24, 29 [approving class definition of "customers" as those " 'who engaged and paid, or caused to be paid, charges for storage insurance or insurance for storage' "]; *Fink v. Fla. Unemployment Appeals Com'n* (Fla.Dist.Ct.App. 1996) 665 So.2d 373, 374 [phrase " 'Home Depot customer' " in employer's conflict-of-interest policy meant "people who purchased materials from Home Depot"]; *Empire Gas Corp. v. Graham* (Mo.Ct.App. 1983) 654 S.W.2d 329, 330–331 [construing "customer[]" as used in restrictive covenant to mean one who has repeated dealings with a particular tradesman or business]; see also *JTL Consulting, L.L.C. v. Shanahan* (Mo.Ct.App. 2006) 190 S.W.3d 389, 398 [following *Empire Gas*].)

In sales transactions Triple Crown required purchasers to sign a "Retail Installment Sales Contract," even though, as here, the vehicle was paid for in

full.[10] Apparently, Triple Crown would permit only an adult to sign such a contract. Kevin was a minor. It therefore appears that Triple Crown would not have sold Kevin a vehicle under any circumstances. It is undisputed that the Blazer was purchased not by Kevin, but by Kevin's father, Anthony. The contract of sale was signed solely by Anthony, who paid the entire purchase price in cash. Kevin did not pay any money to Triple Crown, nor did he sign the contract as a "cobuyer," although the contract provided spaces for a cobuyer's signature. The purchase and sale transaction concerning the Blazer was thus a transaction between Anthony as purchaser and Triple Crown as seller. By the time of the accident, as between the purchaser and seller, that transaction was complete. At the time of the accident, therefore, Kevin was neither a party nor potential party to the purchase transaction. Consequently, for purposes of this sale, Kevin was not Triple Crown's customer.

The fact that Anthony purchased the Blazer to give to Kevin is not determinative of Kevin's status as a customer. To conclude that Kevin is the customer would mean that every gift recipient is the "customer" of the retailer from whom the gift was purchased. That is not how the term "customer" is commonly understood. For whatever purpose Anthony purchased the car, it was *Anthony* who purchased it. Triple Crown would not do business with Kevin and therefore did not treat him as the "customer."

It is not significant that Kevin signed the DMV paperwork and that the Blazer was to be registered in Kevin's name. As the district court stated in its memorandum decision in the Progressive action, the substance of the transaction was that Anthony purchased the vehicle from Triple Crown, and was subsequently to transfer title to the vehicle to Kevin. That the parties sought, albeit ineffectively, to shortcut the formalities of the registration process does not change the fundamental nature of the transaction. As James Kane, Triple Crown's manager, testified, Kevin was listed as the purchaser on the DMV paperwork "[b]ecause that was the wishes [*sic*] of *Anthony McCarty*" (italics added)—*not* because it was Kevin's wish, or the wishes of both Anthony and Kevin. Kane's testimony supports the conclusion that with respect to the sale of the Blazer, Triple Crown considered Anthony to be its customer.

Mid-Century argues that, because Kevin participated in choosing the Blazer and test drove it, he was a "customer" of Triple Crown. Even if prior to the purchase Kevin was a *potential* customer, any such potentiality went unrealized when *Anthony* purchased the Blazer from Triple Crown. Kevin was neither a "customer" nor a potential customer when the accident occurred a week after Anthony had purchased and paid for the car.

---

[10] A "Retail Installment Sales Contract" was used even though there was no installment sale. Installment sales terms were marked as not applicable.

Mid-Century also argues that James Kane of Triple Crown testified that he would "consider a minor to be a customer when they came into [the] shop accompanied by a parent." Kane's testimony is not so clear as Mid-Century represents. As noted above, Triple Crown would enter sales contracts only with adult purchasers. Kane testified, "Well, it was my belief that once the *customer enters into a legal binding contract*, the contract states that the buyer assumes all responsibility for the vehicle." (Italics added.) One can reasonably infer that regardless of whether Kane considered minors to be customers prior to purchase, with respect to the actual sale of a vehicle, Kane considered his "customer" to be the person who entered a "legal binding contract." In this case, that was Anthony. (See *Rager v. Bourgeois* (La.Ct.App. 2006) 951 So.2d 330, 334–335 [testimony of single witness that was "open to conflicting interpretations" regarding whether the driver was a "customer" of a dealership precluded summary adjudication of the issue].)

■ Furthermore, even if the undisputed evidence did not establish as a matter of law that Kevin was not the "customer" of Triple Crown at the time of the accident, for the reasons stated above, the term "customer" is ambiguous in the circumstances of this case. When a policy exclusion is ambiguous, we must construe the exclusion narrowly in favor of coverage. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co., supra*, 40 Cal.4th at p. 27; *Powerine, supra*, 37 Cal.4th at p. 391.)

Although Mid-Century cites none, there are decisions from other jurisdictions that arguably support Mid-Century's position. (See *Marshall v. Seago* (La.Ct.App. 2006) 935 So.2d 752, 757 (*Marshall*) [test driver was "customer" although grandmother was to purchase vehicle for him]; *Bailey v. Federated Mut. Ins. Co.* (Mo.Ct.App. 2004) 152 S.W.3d 355, 358 (*Bailey*) [16 year old who personally paid $2,000 toward purchase price of vehicle was "customer" although remainder to be financed by his grandmother]; *Johnson v. Heritage Mut. Ins. Co.* (Ct.App. 1994) 188 Wis.2d 261 [524 N.W.2d 900, 901–904] (*Johnson*) [friend of potential purchaser, although the friend had "no intention of purchasing any vehicle," was "customer" when he test drove vehicle at potential purchaser's request]; *American States Ins. Co. v. McCann* (1993) 17 Kan.App.2d 820 [845 P.2d 74, 77–78] (*McCann*) [driver was "customer" although unable to obtain financing to purchase car]; *Mattheis v. Heritage Mut. Ins. Co.* (*Mattheis*) (Ct.App. 1992) 169 Wis.2d 716 [487 N.W.2d 52, 54–55] [17 year old was "customer" while driving loaner car provided by dealership to his mother].)

These cases, however, are distinguishable. In *Marshall, supra*, 935 So.2d 752, there is no indication that the test driver was a minor. Moreover, the accident occurred during a test drive, before a sale had been completed. (*Id.* at pp. 754–755.) In *Bailey, supra*, 152 S.W.3d 355, unlike this case, the minor

driver had personally paid the dealership $2,000 toward the purchase price and was included on the purchase and security agreements as a purchaser; he was thus a "customer" in every sense of the word. (*Id.* at p. 356.) In *Johnson, supra*, 524 N.W.2d 900, the court concluded that the test driver was not a permissive user of the dealership because he was driving the car at the potential purchaser's request, and had not been given permission to drive by the dealership. (*Id.* at p. 902.) Further, the accident occurred during a test drive, and there is no indication that the test driver was a minor. (*Id.* at p. 901.) In *McCann, supra*, 845 P.2d 74, the driver had signed a purchase agreement for the vehicle. (*Id.* at p. 75.) In *Mattheis, supra*, 487 N.W.2d 52, the teenaged driver took the car he customarily drove (although owned by his mother) for repairs, and personally signed the repair order and loaner car agreement. (*Id.* at p. 53.)

For the foregoing reasons, it has not been established as a matter of law that Kevin was a "customer" of Triple Crown at the time of the accident. If he was not a customer, he would not be excluded from the Mid-Century policy's definition of "insured" and would therefore be covered under the policy. Summary adjudication on this issue was not appropriate. Because the trial court granted summary adjudication in favor of defendant with respect to plaintiff's bad faith claim and plaintiff's claim under Insurance Code section 11580 on the ground that there was no coverage under the policy, the summary adjudications of those issues were likewise not appropriate.

D. *"Permissive User"*

Plaintiff asserts that, if other issues are resolved in her favor, we should reverse and direct the trial court to grant summary adjudication on the coverage issues in plaintiff's favor. The conclusions that at the summary judgment stage there is evidence that the accident resulted from a "garage operation" and that Kevin is not excluded from the policy as a "customer," however, do not completely resolve the coverage issue. The analysis of the "garage operation" issue assumed that Kevin was an "insured" as a permissive user under the policy. The policy, however, covers permissive users only if the auto used at the time of the accident was owned, hired or borrowed by the policyholder. The parties dispute whether Triple Crown was an "owner" of the Blazer at the time of the accident. The trial court denied the parties' cross-motions for summary adjudication on that issue because neither had established that there were no triable issues of material fact on the issue. On appeal, although plaintiff cites legal authority to negate Mid-Century's contention that it was *not* an owner, she cites no evidence to support summary adjudication in her favor on this issue. Indeed, as previously noted (see fn. 5, *ante*), the trial court excluded nearly all of plaintiff's evidence, and plaintiff has not appealed the trial court's evidentiary rulings. For its part, Mid-Century does not assert its alleged lack of ownership as an alternative basis to

affirm the judgment.[11] To the contrary, Mid-Century asserts that ownership of the Blazer is "irrelevant to the coverage question" raised by this appeal. "The actual weighing of conflicting evidence by the factfinder is a process which can never take place in the context of a summary judgment motion. Only after the actual process of factfinding takes place can the ultimate issue be decided, i.e., whether the claim was actually covered. . . . Appellant is no more entitled than is respondent to entry of judgment on an issue that at this point remains to be decided." (*Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 396 [130 Cal.Rptr.2d 754].) On the present record, therefore, triable issues of material fact preclude summary adjudication of whether Kevin was an insured under the policy as a permissive user of a vehicle owned by Triple Crown.[12]

## DISPOSITION

The judgment is reversed and the matter remanded for further proceedings. Plaintiff is awarded her costs on appeal.

**ARMSTRONG, J.,** Concurring.—I concur in the judgment.

As the opinion points out, plaintiff's theory is that, because Triple Crown incorrectly filled out the Department of Motor Vehicles (DMV) paperwork, title never transferred to Kevin, Triple Crown was still the owner of the Blazer when the accident occurred, and therefore Kevin was insured as a permissive user of the Blazer under Mid-Century's policy. This preliminary issue was not decided by the trial court. Therefore, discussion about other issues is premature. I agree that it cannot be established as a matter of law that Kevin was not covered by the policy if he was a permissive user. I also agree that there are triable issues of fact regarding the permissive use question and that the summary judgment should be reversed.

**TURNER, P. J.,** Dissenting.—I respectfully dissent. The insured had no objectively reasonable expectation of coverage under the garage operations provisions of the policy. The relevant coverage language is found in the portion of the policy entitled, "GARAGE COVERAGE FORM." The pertinent coverage portion of the policy is entitled, " 'GARAGE OPERA-TIONS'—'COVERED AUTOS' " and states, "We will pay all sums an 'insured' must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from 'garage operations' involving the ownership, maintenance or use of covered 'autos.' " The definition of "garage operations" is as follows: " 'Garage operations' means the ownership, maintenance or use of locations for

---

[11] The issues decided are those that are the grounds tendered on appeal.

[12] We publish under, inter alia, California Rules of Court, rule 8.1105(c)(9).

garage business and that portion of the roads or other accesses that adjoin these locations. 'Garage operations' includes the ownership, maintenance or use of the 'autos' indicated in SECTION I of this Coverage Form as covered 'autos'. 'Garage operations' also include[s] all operations necessary or incidental to a garage business." In terms of the latter definitional language, I agree with defendant the second sentence in the definition of garage operations referring to the cars listed in "Section I," is not an independent coverage clause. Rather, the second sentence defines, in the broadest logical sense, the vehicles covered by the garage coverage portion of the policy. Of consequence, but not dispositive, to this analysis is there is other coverage in the policy for automobiles and broader coverage was available. (*Industrial Indemnity Co. v. Apple Computer, Inc.* (1999) 79 Cal.App.4th 817, 836 [95 Cal.Rptr.2d 528] [although not determinative, the "availability of other insurance . . . may, however, shed light on the reasonable expectations of an insured when policy language appears ambiguous . . ."]; see *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1276–1277 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

When the policy is read as a whole, and the language at issue understood in its context, common sense tells us the insured had no objectively reasonable expectation there would be coverage for an accident occurring 50 miles from its location one week after the sale of the car in a place that does not "adjoin" its location and has nothing to do with the operation of a garage business. (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263] [" '[L]anguage in a contract* must be construed in the context of that instrument as a whole . . .' "]; *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1276 ["as a matter of common sense, an objectively reasonable insured would not expect 'advertising injury' coverage to extend as far as the Bank argues it should extend"].) The coverage language relied upon by plaintiff ("resulting from 'garage operations' ") is found in the part of the policy entitled "GARAGE COVERAGE FORM" and underneath the heading, " 'GARAGE OPERATIONS'—'COVERED AUTOS.' " The definitional paragraph uses the word "garage" five times in three brief sentences. Thus, there was no objectively reasonable expectation of coverage. (See *N.C. Farm Bureau Mut. Ins. Co. v. Weaver* (1999) 134 N.C.App. 359 [517 S.E.2d 381, 383–384] [garage owner's forcible repossession of a car not incidental to garage operations]; *Lumbermens Mut. Cas. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co.* (1984) 70 N.C.App. 742 [321 S.E.2d 10, 11–12] [service station employee of the defendant aiding a customer in starting a stalled truck along a highway was incidental to operation of a service station garage]; *Rinehart v. Anderson* (Mo.Ct.App. 1998) 985 S.W.2d 363, 369–370 [car being returned to customer immediately after minor repairs were completed could be found to be " 'necessary or incidental to a garage business' "]; *Northland Ins. v.*

*Boise's Best Autos* (Ct.App. 1997) 132 Idaho 228 [970 P.2d 21, 27], revd. in part on other grounds (1998) 131 Idaho 432 [958 P.2d 589, 591] ["the manner in which the truck was being used by [the insured] was germane to the operation of the business and was encompassed by the term 'garage operations' "]; *Lambert v. Northwestern Nat. Ins. Co.* (Ct.App. 1989) 115 Idaho 780 [769 P.2d 1152, 1155] [" 'use' is limited to garage connected activities"]; *Renda v. Brown* (La.Ct.App. 1990) 563 So.2d 328, 333 ["It is quite clear that the accident did not result from an occurrence arising out of garage operations, therefore, the accident is not covered under the garage operations provision . . ."]; *Continental Insurance Co. v. Colston* (Tex.Civ.App. 1971) 463 S.W.2d 461, 464–465 [Where a garage liability policy covered the "use" of an automobile pursuant to "operations" of a service business, the use of a vehicle for purely personal purposes was not " 'operations of or incidental to' " such an enterprise].)

A petition for a rehearing was denied September 25, 2008, and respondents' petition for review by the Supreme Court was denied November 12, 2008, S167379. Baxter, J., was of the opinion that the petition should be granted.