**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WESTPORT INSURANCE CORPORATION, *Plaintiff-Appellee*, v. CALIFORNIA CASUALTY MANAGEMENT COMPANY, DBA California Casualty, *Defendant-Appellant*. | No. 17-15924 D.C. No. 3:16-cv-01246-WHO OPINION |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted November 15, 2018
San Francisco, California

Filed February 20, 2019

Before: RAYMOND C. FISHER, and MILAN D. SMITH,
JR., Circuit Judges, and LAWRENCE L. PIERSOL*
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

* The Honorable Lawrence L. Piersol, United States District Judge
for the District of South Dakota, sitting by designation.

## SUMMARY[**]

### California Insurance Law

The panel affirmed the district court's summary judgment entered in favor of Westport Insurance Company in a diversity insurance coverage action concerning claims for $15.8 million brought by three former students against Moraga School District and three of its school administrators.

Westport, the primary and excess insurer of the District, defended and settled the claims for $15.8 million, and sought repayment from the administrators' insurer, California Casualty Management Company. The district court found California Casualty liable for $2.6 million of the $15.8 million paid to the underlying plaintiffs collectively.

California Casualty asserted that California Government Code § 825.4, which prohibits public entities from seeking indemnification from its employees, barred Westport's lawsuit because the administrators were public employees, and therefore, the District must defend and pay the entire settlement fee without California Casualty's contribution. The panel held that § 825.4 did not preclude Westport's claim because § 825.4 does not contain a blanket ban on an employee's insurer contributing to the employee's defense and settlement costs. The panel further held that, here, the obligation to defend and indemnify still rested with the public entity and its insurer despite contribution from the employee's insurance.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

California Casualty next asserted that that it was not obligated to contribute to the settlements because its policy covered excess payments only when all other policies had been exhausted, and Westport's primary and excess policies were sufficient to cover the total amount of the settlements. The panel held that this claim was contrary to the plain text of California Casualty's policy. The panel construed California Casualty's policy to apply upon the exhaustion of the $1 million of underlying insurance, not after exhaustion of all other insurance.

California Casualty challenged the apportionment of liability with Westport on a number of grounds. The panel held that California Casualty waived its argument that the lack of contemporaneous allocation of liability in the settlements precluded subsequent apportionment. Next, the panel held that given the blended pleadings and wordings of the settlement agreements, the district court did not abuse its discretion in allocating the liability equally among the District and the three administrators. The panel rejected California Casualty's challenge to the district court's finding that Westport only needed to pay $1 million per occurrence instead of $1 million per occurrence per insured, totaling $3 million. The panel further held that California Casualty's policy coverage began upon exhaustion of Westport's primary policy when Westport paid $1 million per policy per student. The panel rejected California Casualty's contention that its coverage should prorate with Westport's coverage.

The panel held that the district court did not abuse its discretion in awarding prejudgment interest at ten percent from the dates Westport paid the settlements.

## COUNSEL

Mark G. Bonino (argued), Charles E. Tillage, and Elizabeth J. Moul, Hayes Scott Bonino Ellingson Guslani Simonson & Clause LLP, San Carlos, California, for Defendant-Appellant.

Adam H. Fleischer (argued), Michael H. Passman, and Mark G. Sheridan, Bates Carey LLP, Chicago, Illinois; Michael K. Johnson, Lewis Brisbois Bisgaard & Smith LLP, San Francisco, California; for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

This appeal involves a dispute between two insurance companies that arose after the settlement of certain claims brought against their insureds. After Westport Insurance Corporation (Westport) defended and settled claims for $15.8 million brought by three former students against Moraga School District (the District) and three of its school administrators, it sought repayment from the administrators' insurer, California Casualty Management Company (California Casualty). The two insurers cross-moved for summary judgment, and the district court held that California Casualty owed Westport $2.6 million plus $755,637.20 in prejudgment interest. We affirm.

## BACKGROUND

Westport, through a predecessor company, issued primary general liability insurance policies (Westport's Primary policy) to the District from 1991 through 1997. From October 1, 1994 to October 1, 1997, Westport also

issued a series of annual excess policies that covered the District and its employees (Westport's Excess policy).

California Casualty issued successive annual liability policies to the Association of California School Administrators from at least July 1, 1986 to July 1, 2000. California Casualty provided excess liability to the District's school administrators under this policy's Coverage A plan, titled Administrators Excess Liability (California Casualty's policy).

To provide a framework for our analysis, we first outline the claims included in the underlying lawsuits. On January 29, 2013, Doe 1 and Doe 2, two former students of the Moraga School District, filed suit in the Superior Court for Contra Costa County, California against the District and three of its school Administrators—William Walters, John Cooley, and Paul Simonin. Earlier that same month, another former student, Doe 3, also sued the three Administrators and the District. In these lawsuits, the several Does alleged that the District's employee, Daniel Witters, sexually molested them in the mid-1990s while he was their middle school teacher. The Does alleged that the Administrators received warnings about the molestations, but the Administrators failed to act to stop Witters. When the students came forward in 1996, Witters killed himself. In their lawsuits, Doe 1 alleged that Witters molested her during policy periods 1993–94, 1994–95, and 1995–96; Doe 2 alleged that she was molested in the 1995–96 and 1996–97 periods; and Doe 3 alleged that she was molested in the 1996–97 period.

In January 2013, both Westport and California Casualty attended an unsuccessful mediation of the Does' lawsuits. The Doe 3 lawsuit eventually settled separately for $1.8 million in August 2013, but Westport appears to have paid the settlement on July 29, 2013, prior to the signing of the settlement agreement. In June 2014, California Casualty and Westport also attended a mediation for the lawsuit brought by Does 1 and 2. At the mediation, Does 1 and 2 settled their lawsuit for $7 million each. On June 26, 2014, Westport paid Does 1 and 2. California Casualty subsequently refused to contribute to any of the Does' settlements (the Settlements), and Westport funded the entirety of these Settlements in the aggregate sum of $15.8 million.

On July 11, 2014, Westport demanded that California Casualty pay its share of the Settlements, but received no response. Westport wrote to California Casualty three additional times, and received no response. After Westport's October 30, 2014 demand, California Casualty finally replied and refused to reimburse Westport.

Westport then filed suit against California Casualty on April 13, 2015 in federal court. After the parties brought cross-motions for summary judgment, the district court entered summary judgment in favor of Westport for $2.6 million plus interest. A month later, the district court added $755,637.20 of prejudgment interest to the judgment. California Casualty timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review the district court's grant or denial of summary judgment de novo. *Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 918 (9th Cir. 2009). We also

review its interpretation of state law and the insurance policies de novo. *Id.* at 920; *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 624 (9th Cir. 1996). The district court's award of prejudgment interest is reviewed for abuse of discretion. *Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 714 (9th Cir. 1992).

## ANALYSIS

### I. Indemnification pursuant to California Government Code § 825.4

As a threshold matter, California Casualty asserts that California Government Code § 825.4 (§ 825.4), which prohibits public entities from seeking indemnification from its employees, bars Westport's lawsuit. California Casualty contends that because the Administrators were public employees, the District must defend and pay the entire settlement fee without its contribution. The California Supreme Court has not spoken directly on this issue, so "we must determine what result the court would reach based on state appellate court opinions, statutes and treatises." *Evanston*, 566 F.3d at 921 (quoting *Paulson v. City of San Diego*, 294 F.3d 1124, 1128 (9th Cir. 2002) (en banc)).

Section 825.4 provides:

> Except as provided in Section 825.6, if a public entity pays any claim or judgment against itself or against an employee or former employee of the public entity, or any portion thereof, for an injury arising out of an act or omission of the employee or former

> employee of the public entity, he is not liable
> to indemnify the public entity.

Cal. Gov't Code § 825.4.[1]

Only a few California Court of Appeal cases analyze § 825.4. Westport primarily relies on a line of cases beginning with *Oxnard Union High School District v. Teachers Insurance Co.*, 99 Cal. Rptr. 478 (Ct. App. 1971), whereas California Casualty cites to *Pacific Indemnity v. American Mutual Insurance Co.*, 105 Cal. Rptr. 295 (Ct. App. 1975).

Unfortunately, neither set of cases definitively addresses the factual pattern present in this case. Nevertheless, we affirm the district court's conclusion that § 825.4 does not preclude Westport's claim because § 825.4 does not contain a blanket ban on an employee's insurer contributing to the employee's defense and settlement costs. Here, the obligation to defend and indemnify still rests with the public entity and its insurer despite contribution from the employee's insurance. We find support for our holding in the principles animating the several § 825.4 cases.

In *Oxnard*, the California Court of Appeal held that although the teacher-employee's school district was "obligated to pay in full" the settlement of an automobile crash negligence action against the teacher, the school district had discharged its liability by using the teacher's

---

[1] The exceptions set forth in § 825.6 contemplate whether the employee or former employee "acted or failed to act because of actual fraud, corruption, or actual malice, or willfully failed or refused to conduct the defense of the claim or action in good faith." Cal. Gov't Code § 825.6. Neither party claims that these exceptions are at issue in this case.

insurance as primary coverage and its own insurance as excess coverage. 99 Cal. Rptr. at 480. *Oxnard*'s progeny similarly involved automobile accidents committed by employees during the scope of their employment.**²**

In the first case, the teacher-employee's automobile insurer, GEICO, defended a negligence suit against the teacher, paid the settlement, and then sought to recoup the amount paid from the school district's insurer. *Gov't Emps. Ins. Co. v. Gibraltar Cas. Co.*, 229 Cal. Rptr. 57, 60 (Ct. App. 1986). After considering the relevant portions of the automobile policy and the insurance code, the court concluded that the school district "was *itself* an insured under the GEICO policy," due to the language in GEICO's policy that defined persons insured as "any other person or organization for his or its liability because of the acts or omissions of any insured." *Id.* at 64 (emphasis added). Thus, the school district satisfied its statutory obligation by availing itself of the employee's automotive insurance policy as long as the employee remained fully covered. *Id.* at 65.

Similarly, in *Younker v. County of San Diego*, a firefighter-employee and his automobile insurer sued the county-employer to recover expenses for defending and settling a claim against the firefighter arising from an automobile crash. 285 Cal. Rptr. 319, 321 (Ct. App. 1991). The court first determined that the county was an insured pursuant to the terms of the employee's automobile policy because it was "clearly a person or organization liable because of [the employee's] acts or omissions" as defined

---

**²** *Oxnard* involved Section 825, which covers defense by a public entity, not § 825.4 specifically. Nevertheless, *Oxnard*'s progeny involved automobile accidents committed by employees and public entity indemnification under § 825.4.

under the policy. *Id.* at 323. The court then held that the county properly looked to the employee's insurer to fulfill its own statutory obligation, thereby rejecting the employee's argument that using the proceeds of his policy for the settlement contravened § 825.4. *Id.* at 323–24.

In contrast, the court in *Pacific Indemnity* barred an insurer's attempt for settlement cost recovery from the employee's insurance. There, a patient sued a physician employed by the University of California (UC) for injuries caused by the physician-employee's medical services. 105 Cal. Rptr. at 296. After the settlement, the UC's insurer brought an action for contribution against the physician's insurer. *Id.* The California Court of Appeal first noted that under § 825.4, primary liability for the expenses of the settlement lay with the UC, and thus the insurer "c[ould] only secure contribution if there is other insurance covering the obligation of the Regents." *Id.* at 302. The court held that the UC's insurer could not look to the physician's insurer for contribution because to do so would not be consistent with California's policy rationale of public entities indemnifying their employees. *Id.* at 303.[3] The court distinguished *Oxnard* and observed it should not apply where "there is neither concession nor contract provision which renders the employee's insurance available for the satisfaction of the public entity's obligation to the victim or . . . its employee." *Id.* at 305.

Several principles discernable from the *Oxnard* and *Pacific Indemnity* line of cases guide our conclusion that

---

[3] In *Pacific Indemnity*, the court was particularly concerned because the employee's personal policy did not just cover claims arising in the course of employment but any acts or omissions that were not within the scope of the employment. The court noted that this impermissibly placed the burden of insurance on the employee personally.

§ 825.4 does not preclude Westport's suit.  First, indemnification pursuant to § 825.4 is not wholly inconsistent with contribution from an employee's insurer. In *Oxnard* and its progeny, the courts expressly permitted the employees' personal insurance, albeit automotive, to pay the entirety or majority of the settlement, even though the courts first found that the public entities were liable pursuant to the provisions of Section 825.  Even in *Pacific Indemnity*, the court noted that another insurer could contribute to settlement costs if the language of that insurance policy also covered the public entity's obligation.  105 Cal. Rptr. at 296.

Second, the employee and his employer do not occupy equivalent positions for purposes of indemnification analysis.  In both *Younker* and *Gibraltar*, the courts differentiated between the employee and his insurer when considering whether Section 825's prohibition on a public entity seeking indemnity from its employee required the entities' insurers to reimburse the employees' insurers.  The courts rejected the employees' insurers' position in part because none of the employees had personally contributed to the settlement costs.  *Younker*, 285 Cal. Rptr. at 323 (noting the employee "did not foot the bill"); *Gibraltar*, 229 Cal. Rptr. at 61 (noting employee "paid nothing" of the settlement).

Third, where the employee's policy is available to the public entity as an insured, contribution to the defense and settlement costs may be permitted.  *Pacific Indemnity*, *Younker*, and *Gibraltar* all recognized this principle either explicitly, as in *Pacific Indemnity*, or implicitly by first finding that the entity-employer was an insured under the employee's policy, as in *Younker* and *Gibraltar*.

Here, policy concerns regarding the proper placement of the burden of settlement costs are assuaged.  The District

furnished primary and excess insurance to its Administrators through Westport.  There is no evidence in the record, and neither party claims, that any of the Administrators personally contributed to the settlement.  That their insurer, California Casualty, is now being called upon to provide its excess coverage to cover the employees' settlements does not violate the intent behind § 825.4 indemnification.  In addition, California Casualty's policy is limited to claims arising in the course of employment.

Furthermore, *Pacific Indemnity* held that a "concession" or "contract provision which renders the employee's insurance available for the satisfaction of the public entity's obligation" would satisfy § 825.4.  105 Cal. Rptr. at 304.  California Casualty's policy contemplates this exact situation when it states that the underlying primary insurance must be provided under one of several sections of the Education Code, Cal. Gov't Code §§ 825 or 825.4 or provided on behalf of the insured by any public educational entity.

For these reasons, we hold that § 825.4 does not preclude Westport's claim against California Casualty for repayment of a portion of the Settlements.

## II. Interpretation of Westport's and California Casualty's Policies

California Casualty next claims that it is not obligated to contribute to the Settlements because its policy covers excess payments only when all other policies have been exhausted, and Westport's Primary and Excess policies are sufficient to cover the total amount of the Settlements.  Westport counters that this claim is contrary to the plain text of California Casualty's policy.  We agree with Westport.

Under California law, interpretation of insurance policies "follows the general rules of contract interpretation." *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472, 477 (Cal. 2006). Courts construe policy provisions in their ordinary and popular senses, unless used by the parties in a technical manner or with a special meaning. *Id.* Insurance coverage is also construed broadly "so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are to be interpreted narrowly against the insurer." *Id.*

California Casualty's policy covers "all damages in excess of the required underlying primary collectible insurance or self-insurance." Administrator excess liability is capped at $150,000 per occurrence per insured, over the $1 million underlying primary layer, and the policy has a $2 million aggregate limit per annual policy period. The exclusions further explain, "There shall be no insurance afforded under this policy until the required $1 million limit of liability afforded the insured by such other insurance or self-insurance is exhausted."

These provisions clarify that California Casualty's insurance is not "excess over all other insurance" as it claims. California Casualty's policy is certainly an "excess" policy, but it requires only that the "underlying primary collectible insurance or self-insurance" be exhausted before its coverage begins. The policy requires the exhaustion of only "primary" or "self" insurance as opposed to "all other" insurance or "primary and excess" insurance. Comparatively, Westport's Excess policy states, "If there is *any other* collectible insurance available to the insured . . . [this insurance] will apply *in excess of other* collectible insurance." (Emphasis added.) *See Carmel Dev. Co. v. RLI Ins. Co.*, 24 Cal. Rptr. 3d 588, 592, 598 (Ct. App. 2005)

(finding insurance policy that stated it would pay "sums in excess of Primary Insurance" was triggered prior to a policy that applied in excess of other "primary, excess or excess-contingent insurance").[4]      Accordingly, we construe California Casualty's policy to apply upon the exhaustion of the $1 million of underlying insurance, not after exhaustion of all other insurance.

## III.    Apportionment of Liability

The district court allocated liability between Westport and California Casualty in the following manner.  First, the court divided each Doe's settlement equally across the policy period(s) in which she alleged she was molested.  Next, the court reduced each policy period amount by 25 percent to reflect the District's liability.  Then, the court deducted $1 million from each policy period in accordance with Westport's Primary policy limit.  Finally, the court assessed liability against California Casualty up to $150,000 for each Administrator in each policy period.[5]  In total, the district court found California Casualty liable for

---

[4] California Casualty also notes that its low premium is indicative of its position as extreme excess coverage.  This argument deserves only short shrift.  California Casualty does not point to any authority that premium size determines priority of coverage.  Moreover, California Casualty's corporate designee testified that the amount of the premium does not determine the policy's order of payment.

[5] To illustrate, Doe 1's $7 million settlement was divided into three amounts of $2,333,333 for each of the policy periods 1993–94, 1994–95, and 1995–96.  Next, in each of these periods, the court reduced the amount by 25 percent to $1.75 million.  Then, the court deducted $1 million of Westport's primary limit, leaving $750,000.  The court then assessed $150,000 per administrator for a total of $450,000 against California Casualty.

$2.6 million of the $15.8 million paid to the Does collectively.

California Casualty contends that it should not contribute to the Settlements for the following reasons: (1) the allocation of liability among the defendants was erroneous; (2) Westport did not pay the mandatory $1 million per administrator per student per policy period; (3) California Casualty's policy does not trigger until $1 million is paid per administrator per student for each policy period; and (4) even if California Casualty were obligated to contribute, its apportioned contributions for the Administrators should prorate along with Westport's policies.  We consider each argument in turn.

## A.  Allocation of Liability Among the Administrators and the District

California Casualty first argues that the district court was unable to properly apportion any liability to it.  Although California Casualty's duty to defend did not rise until exhaustion of the primary layer of coverage, it denied excess coverage in the face of settlement demands far exceeding the primary layer.  As the district court noted, in *United Services Automotive Association v. Alaska Insurance Co.*, 114 Cal. Rptr. 2d 449, 453 (Ct. App. 2001), the court held that "when an excess insurer denies excess coverage for a third party claim, it waives the right to challenge the reasonableness of the primary insurer's settlement of the claim."  Therefore, California Casualty has waived its argument that the lack of contemporaneous allocation of liability in the Settlements precludes subsequent apportionment.

Because California Casualty is only liable for the Administrators' liability, it next argues that the district court erroneously allocated the Settlements equally among the

four underlying defendants.   Under California law, trial courts have "equitable discretion to fashion a method of allocation suited to the particular facts of each case and the interests of justice, subject to appellate review for abuse of that discretion."   *Golden Eagle Ins. Co. v. Ins. Co. of the West*, 121 Cal. Rptr. 2d 682, 693 (Ct. App. 2002).   Moreover, "there is no single method of allocating defense or indemnity costs among co-insurers."   *Id.*

The district court divided liability equally among the four defendants, and cited *Great American Insurance Co. v. Sequoia Insurance Co.*, 2016 WL 844819 (C.D. Cal. Mar. 1, 2016), *appeal dismissed*, No. 16-56080 (9th Cir. Mar. 2, 2018), in support of its decision.   In *Great American*, the court determined that it had the discretion to allocate liability equally between the co-defendants in a case where the settlement agreement did not specifically allocate responsibility for the amounts to the defendants and both causes of action were alleged against both defendants.   2016 WL 844819, at *12.   Similarly here, Does 1 and 2's complaint raised four causes of action against all four defendants, and the fifth cause of action against only unknown doe defendants.   Doe 3's complaint brought all claims against all defendants.   The three settlement agreements released the District and the Administrators from liability and did not differentiate among the defendants. Given the blended pleadings and wording of the settlement agreements, the district court did not abuse its discretion in allocating the liability equally among the District and the three Administrators.[6]

---

[6] California Casualty argues that it was not the primary insurer, unlike the insurer in *Great American*, and therefore the four defendants should not share liability evenly.  However, the *Great American* court's

## B.  Westport's Contribution

California Casualty challenges the district court's finding that Westport only needed to pay $1 million per occurrence instead of $1 million per occurrence per insured, totaling $3 million.   We find California Casualty's arguments to be without merit.

Although California Casualty's policy and Westport's Primary policy define "occurrence" similarly, they differ on how they cover liability per occurrence.  Westport's Primary policy defines an occurrence as "an accident, including continuous or repeated exposure to conditions, which . . . results in injury, or damages to which this insurance applies."  California Casualty's policy defines an occurrence as "an event, including injurious exposure to conditions, which results in injuries and/or damage to one or more persons or legal entities . . . .  An occurrence can involve a single sudden event or the continuous or repeated injurious exposure to conditions."  The district court held that, because under California Casualty's policy each Administrator is an insured, California Casualty was required to pay $150,000 per Administrator per occurrence per student for each policy period.  Conversely, Westport's Primary policy contains a clause that states the policy applies to each separate insured, but "nothing herein shall operate to increase the Company's liability . . . beyond the amount or amounts for which the Company would have been liable if only one person or interest had been named as insured."  Thus, the district court

division of liability between co-defendants did not turn on the status of the insurance companies, but rather on the pleadings and settlement agreements. *Great American*, 2016 WL 844819, at *12.  In fact, in terms of actual monetary liability, the court ordered the co-primary insurer to pay its $1 million limit, not half of the total $3 million settlement, despite its insured being apportioned "equal" liability. *Id.* at *13.

held that under Westport's Primary policy, Westport was required to cover $1 million per occurrence per student for each policy period, but *not* per administrator.

California Casualty does not now challenge the district court's decision that, under its policy, each "occurrence" requires coverage per student per administrator for each policy period. Instead, California Casualty now contends that if each occurrence is so defined, then Westport should have been required to pay $3 million per policy period because there were three Administrators, in the same manner the district court ordered California Casualty to pay up to $450,000 per policy period. This argument is unavailing.

As noted, Westport's Primary policy contains a provision explaining that although its policy insures each individual employee separately, if multiple insureds are named, the policy operates to limit liability as "if only one person . . . had been named as insured." This provision clearly limits Westport's liability in the present situation wherein multiple insureds—three Administrators and the District—all allegedly failed to supervise the teacher. California Casualty's policy contains no such limitation clause.

## C.  California Casualty's Contribution

California Casualty next contends that its own obligation does not arise until $1 million is paid per insured regardless of the source—the Westport Primary policy, any other policy, or through self-insurance. California Casualty's policy defines "the insured" as "a member of the Association of California School Administrators who is employed by a school board, board of trustees or similar governing body of an educational unit." According to California Casualty, Westport only paid $333,333.333 per each insured;

therefore, California Casualty's policy does not trigger under its terms until some entity pays $1 million per insured. Keeping in mind that under California law insurance coverage is to be construed broadly, we find Westport's payment of $1 million per period did trigger California Casualty's policy.

First, California Casualty's policy text does not support its interpretation of when its policy is triggered.  California Casualty's policy states:

> At the time of an occurrence there must be underlying primary collectible insurance or self-insurance available to the insured . . . with a minimum per occurrence limit of $1,000,000.00.  There shall be no insurance afforded under this policy until the required $1 million limit of liability afforded the insured *by such other insurance* or self-insurance is exhausted. (Emphasis added).

The phrase "such other insurance" is an antecedent phrase referring back to the previous sentence, which defines the requisite primary insurance as insurance "with a minimum per occurrence limit of $1,000,000."  Although California Casualty's policy denotes a per occurrence limit, it does not require that the $1 million limit in the primary policy must also apply per insured, as California Casualty now suggests it should.  *See State Farm Mut. Auto Ins. Co. v. Partridge*, 514 P.2d 123, (Cal. 1973) (holding "all ambiguities in an insurance policy are construed against the insurer-draftsman").

Furthermore, the Administrators complied with the written requirements of California Casualty's policy in obtaining their primary policy.  The California Casualty

policy requires primary collectible insurance with a "minimum per occurrence limit of $1 million" be available to the insured pursuant to the Education Code or other provisions governing insurance for public entities. Westport's Primary policy was issued pursuant to the Education Code provisions explicitly mentioned in California Casualty's policy and provided a per occurrence limit of $1 million. Therefore, each Administrator had the requisite $1 million of primary insurance available to him.

Second, California Casualty's policy only requires that this underlying insurance of $1 million "afforded the insured by such other insurance or self-insurance is exhausted." This language does not clearly require that $1 million be exhausted per insured or even for the same occurrence, just that it be exhausted. Westport's Primary policy covering $1 million was exhausted according to its terms. To interpret California Casualty's policy to require its insureds to obtain additional insurance in the event their primary insurance exhausts prior to reaching the $1 million contribution would create yet another potential layer of insurance coverage that is not required by the policy itself. On its face, California Casualty's policy requires only the exhaustion of the underlying $1 million primary insurance before California Casualty's coverage begins. That occurred here.

Imagine a hypothetical scenario wherein a prior settlement or series of settlements exhausts Westport's primary insurance up to its annual aggregate limit of $3 million rendering Westport's primary policy unable to contribute to the $1 million of underlying insurance required by California Casualty's policy. If California Casualty's interpretation of its policy were correct, California Casualty would then provide zero coverage—because the $1 million

per insured was not reached—contrary to its policy language that it pays all damages in excess of the required underlying insurance.    This hypothetical illustrates the untenable position California Casualty advances.

Given that insurance exclusions must be "interpreted narrowly against the insurer," *TRB Invs.*, 145 P.3d at 477, we construe the ambiguity of California Casualty's policy against it and in favor of its insureds.  In sum, we hold that California Casualty's policy coverage began upon exhaustion of Westport's Primary policy when Westport paid $1 million per policy period per student.

### D.  Proration of the Policies

California Casualty also contends that its coverage should prorate with Westport's coverage.  A pro rata clause "provides that if there is other valid and collectible insurance, then the insurer shall not be liable for more than his pro rata share of the loss."  *Olympic Ins. Co. v. Emp'rs Surplus Lines Ins. Co.*, 178 Cal. Rptr. 908, 911 (Ct. App. 1981).  California courts tend to prorate the loss among co-insurers with conflicting excess clauses.  *Id.*  This situation often occurs when both insurers *on the same level* have excess clauses that deem the policy excess to other valid and collectible insurance.  *See id.* at 912 (prorating two primary insurers' policies where both purported to be excess to the other).

The text of the insurance policies in this case belies California Casualty's claim that they prorate.  California Casualty's policy plainly states that it "shall not be construed to be pro rata, concurrent or contributing with any other insurance or self-insurance which is available to the Insured."  Further, California Casualty's policy does not occupy the same level of insurance coverage as either of

Westport's policies. As discussed, the exhaustion of Westport's Primary policy triggers liability under California Casualty's policy. Only when California Casualty's policy is exhausted does Westport's Excess policy become liable. Westport's Excess policy clearly states, "If there is any other collectible insurance available to the insured that covers a loss that is also covered by this policy, the insurance provided by this policy will apply in excess of other collectible insurance." Accordingly, California Casualty's policy is sandwiched between Westport's Primary and Excess policies. There is no conflict between California Casualty's policy and either of Westport's policies such that they should prorate.

## IV.    Prejudgment Interest

California Casualty asserts that the district court should have awarded prejudgment interest at seven percent, running from July 11, 2014—the date of Westport's first demand letter for payment. The district court awarded prejudgment interest at ten percent, running from the dates Westport paid each of the Settlements. We find no abuse of discretion in the district court's determination to award prejudgment interest at ten percent from the dates Westport paid the Settlements.

State law governs prejudgment interest in a diversity action. *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1139 (9th Cir. 2011). The California Constitution generally affixes the rate of prejudgment interest at seven percent per annum for judgments rendered in state courts unless specified otherwise by the legislature. Cal. Const. Art. 15, § 1. However, the California Civil Code sets prejudgment interest on contract actions at ten percent per annum if the rate is not otherwise stipulated in the contract. Cal. Civ. Code § 3289. California Casualty argues that

because Westport labeled its cause of action "equitable contribution," which is not a contract action, Westport should only receive prejudgment interest at the rate of seven percent.  Westport counters that the district court correctly determined that despite the characterization, its action was one for equitable subrogation, which sounds in contract, and that the district court properly awarded prejudgment interest at ten percent.

The California Court of Appeal explained the difference between equitable contribution and equitable subrogation in *Fireman's Fund Insurance Co. v. Maryland Casualty Co.*, 77 Cal. Rptr. 2d 296 (Ct. App. 1998).  Equitable subrogation puts the insurer in the position of the insured "to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid." *Fireman's Fund*, 77 Cal. Rptr. 2d at 302.  In contrast, equitable contribution is to "apportion a loss between two or more insurers who cover the same risk, so that each pays its fair share and one does not profit at the expense of the others."  *Id.* at 306.

These definitions clarify that Westport incorrectly labeled its cause of action as one for "equitable contribution."  *See K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc*., 90 Cal. Rptr. 3d 247, 261 (Ct. App. 2009) (holding the facts, not the labels, in a pleading determine whether a plaintiff is entitled to relief).  We do not interpret California Casualty's policy and Westport's Excess policy to "cover the same risk."  Instead, these two excess policies create stratified levels of coverage within the excess layer.  Accordingly, the district court did not abuse its discretion in holding that notwithstanding the erroneous title for its claim, Westport's action is one for equitable subrogation and entitled to ten percent prejudgment interest.

We similarly find meritless California Casualty's argument regarding the date from which the prejudgment interest should run.  California Civil Code § 3287(a) states in pertinent part:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt . . . .

Cal. Civ. Code § 3287(a).  The test for recovery under this provision is "whether [the] defendant actually knows the amount owed or from reasonably available information could the defendant have computed that amount." *Children's Hosp. & Med. Ctr. v. Bonta*, 118 Cal. Rptr. 2d 629, 654 (Ct. App. 2002).  When the allocation of liability turns on factual issues, damages are uncertain; however, when the allocation turns exclusively on legal issues, damages are certain and interest is available.  *State v. Cont'l Ins. Co.*, 223 Cal. Rptr. 3d 716, 735 (Ct. App. 2017).  Where the challenge concerns the interpretation of the relevant policy language, the parties present a pure legal question.  *Id.* at 736.

California Casualty asserts that California's mediation privilege prevents disclosure of Westport's letters it received on May 30, 2014, June 10, 2014, and October 9, 2014, and of the settlement agreements themselves, and, therefore, that damages did not become certain until July 11, 2014, , as opposed to July 29, 2013 and June 26, 2014.

California's mediation privilege prohibits any writing "prepared for the purpose of, in the course of, or pursuant to, a mediation or mediation consultation" to be admissible in any civil action in which testimony can be compelled to be given." Cal. Evid. Code § 1119(b). In addition, "all communications . . . by and between participants in the course of a mediation" shall remain confidential. Cal. Evid. Code § 1119(c). While the district court erred in overruling California Casualty's objection to the disclosure of these letters,[7] though not to the settlement agreements,[8] this error does not affect resolution of this issue, because the damages were certain on the Settlements' payment dates regardless of the admissibility of the demand letters.

In *Continental Insurance*, the court rejected the insurer's argument that damages were uncertain because the companies disputed the number of covered occurrences. 223 Cal. Rptr. at 737. The court determined that this dispute

---

[7] The district court overruled the objection pertaining to the letters, finding that because they were between California Casualty's corporate representative and attorney and Westport's attorney, they were not between the "disputants in the mediation." The district court defined the disputants solely as the Does, the District, and the Administrators. However, the mediation privilege "extends beyond discussions carried out directly between the opposing parties to the dispute, or with the mediator, or during the mediation proceedings themselves" to "all oral or written communications . . . made for the purpose of or pursuant to a mediation." *Cassel v. Super. Ct.*, 244 P.3d 1000, 1084 (Cal. 2011). The letters concerned Westport's possibility of settling beyond its primary limits during the mediation. Accordingly, they fall within the mediation privilege under California law.

[8] *See In re Marriage of Daly & Oyster*, 175 Cal. Rptr. 3d 364, 368 (Ct. App. 2014) (explaining that, under Cal. Evid. Code § 1123, the mediation privilege does not cover signed written settlement agreements produced during mediation when the agreement contains terms signifying the parties' intent to be bound by it).

posed a question of liability that did not affect the certainty of damages. *Id.* The appellate court then upheld the trial court's award of mandatory prejudgment interest from the date of judgment. *Id.* at 720.

The present case also concerns the interpretation and prioritization of the insurance policies at issue—all legal questions. Accordingly, California Casualty is liable for prejudgment interest from the "date of settlement because that is the date that the loss is certain or capable of being made certain by calculation." *Id.* at 735. We hold that the district court did not abuse its discretion in awarding prejudgment interest from the dates on which Westport paid the Settlements—July 29, 2013, and June 26, 2014. *See Highlands Ins. Co. v. Cont'l Cas. Co.*, 64 F.3d 514, 522 (9th Cir. 1995) (finding no abuse of discretion for prejudgment interest to begin running on the insurer's date of payment rather than the date of its complaint for reimbursement). On these dates, Westport's primary layer of coverage was exhausted, and Westport overpaid on its Excess policy due to California Casualty's failure to provide its coverage.

## CONCLUSION

We hold that California Government Code Section 825.4 does not preclude Westport's lawsuit against California Casualty, and we affirm the district court's decision on all the remaining issues raised on appeal.

**AFFIRMED.**