340 So.2d 667 (1976)
Ranton BROUILLETTE
v.
PHOENIX ASSURANCE COMPANY.
Ranton BROUILLETTE
v.
Vincent BROUILLETTE.
No. 7701.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 1976.
Rehearing Denied January 12, 1977.
Writ Refused March 16, 1977.
*669 Lemle, Kelleher, Kohlmeyer & Matthews, Charles E. Lugenbuhl and Stanley A. Millan, New Orleans, for plaintiff-appellant.
Christovich & Kearney, J. Walter Ward, Jr., New Orleans, for Phoenix Assur. Co.
Oliver S. Livaudais, Jr., Charles H. Livaudais and Robert J. Klees, Chalmette, for Vincent Brouillette.
Before REDMANN, LEMMON and SCHOTT, JJ.
SCHOTT, Judge.
These consolidated cases arose out of an incident in which defendant Vincent Brouillette deliberately drove a bulldozer into a wooden frame house allegedly owned by plaintiff, knocking the house from its foundation and causing it to be extensively damaged. In the first suit, plaintiff sought to recover from his insurer, Phoenix Insurance Company of New York, the policy limits of $10,000 under the malicious mischief and vandalism portions of the policy. In the other suit, plaintiff sought to recover from Vincent Brouillette damages in the amount of $24,000, consisting of damage to his house, alleged to be $13,000, plus the cost of removal of the house, rental income and exemplary damages. In the second suit Phoenix intervened to recover from Vincent whatever amount for which it might be cast in judgment in favor of plaintiff in the first suit. From a judgment dismissing plaintiff's claims in both suits he has taken an appeal.
In January, 1967, plaintiff purchased from the Louisiana Department of Highways the house in question for $776. It was then located in the City of New Orleans on the right-of-way of the Interstate-10 Highway and was moved at a cost of $850 to Lot 22 in Creedmore Subdivision in St. Bernard Parish. Creedmore Subdivision was owned and being developed by plaintiff and his two brothers, Vincent and Bruman Brouillette. Lot 22 was owned by a partnership composed of the three brothers. Between January and February, 1967, plaintiff employed carpenters to repair the house and had repairs done to the roof. According to his testimony he personally worked on the house in his spare time from the time it was placed on the lot until August of 1968, when the incident which is the subject of these suits took place. Plaintiff testified that as of that date he still had four or five more days of work to do on the house consisting of a walk and a concrete slab on the front porch, after which the house would be ready to rent.
There were hard feelings between plaintiff and his two brothers. The latter apparently resented the general attitude plaintiff took in connection with their business dealings, and specifically they objected to plaintiff's placing this house in this particular location because they felt that it was incompatible with the new brick homes which had been constructed in that area of Creedmore Subdivision. An illustration of the extent of the animosity which existed among the brothers was an incident which took place about six months prior to the bulldozing incident of August, 1968, in which plaintiff had taken a sledge hammer and demolished a portion of a house being worked on by Vincent in another part of the Creedmore Subdivision. Vincent admitted that on August 22, 1968, he deliberately shoved the house off its foundation with a bulldozer. He explained his conduct on the basis that his brother over the years had provoked him because of the manner in which he treated him in their business operations.
In dismissing the suit against Phoenix the trial court reasoned that because Lot 22 was owned by the partners the house placed *670 on the lot became the property of the partners, with the result that plaintiff had no right to recover under the policy for the loss of the house. Furthermore, he reasoned that the tortious act of Vincent was imputed to plaintiff because of their partnership relationship so that he was denied recovery just as though he were making a claim occasioned by his own tortious act.
With respect to the dismissal of the tort claim by plaintiff against Vincent, the court reasoned that this was a demand by one partner against another in advance of a settlement of partnership affairs and that such a demand was premature until a liquidation of the partnership would be effected.

PLAINTIFF'S CLAIM AGAINST PHOENIX
We do not agree with the trial judge that the house became the property of the partnership simply because the land itself was owned by the partnership. While the ownership of the soil normally carries with it the ownership of all that is directly above and below it, LSA-C.C. Art. 505, Art. 506 provides that "[C]onstructions . . . made on . . . the soil, are supposed. . . to belong to [the owner] unless the contrary be proved . . ." Art. 508 outlines certain conditions under which the owner of the soil may become the owner of works made on the soil by a third person. Based on these articles and the jurisprudence construing them, cf. Louisiana Land & Pecan Co. v. Gulf Lumber Co., 134 La. 784, 64 So. 713, and the testimony of all three brothers that plaintiff purchased and constructed the house for himself, we have concluded that the trial judge erred in holding that this house became the property of the partners. It follows that plaintiff, as the owner of the house, had a right to collect the proceeds under the policy insuring him against vandalism by anyone, including his brother, even though they were engaged in a partnership with respect to their business dealings. There is no basis for the imputation of Vincent's malicious act to plaintiff who was the victim of the tort which caused the damage to the insured house. We have thus rejected the reasoning of the trial court in disposing of plaintiff's claim against Phoenix.
In this Court Phoenix has strenuously urged its special defense of a lack of coverage based upon the following provisions of the policy:
"1. This Company shall not be liable for loss if the described building(s) had been vacated or unoccupied beyond a period of thirty (30) consecutive days immediately preceding the loss, whether or not such period commenced prior to the inception date of this endorsement; but a building in process of construction shall not be deemed vacant or unoccupied, nor shall the unoccupancy provision of this endorsement be applicable to private dwelling property or to property described as seasonal on the first page of the policy.
Definitions:
VacantContaining no contents pertaining to operations or activities customary to occupancy of the building.
UnoccupiedContaining contents pertaining to occupancy of the building while operations or other customary activities are suspended."
The insured house was always vacant and was never occupied but the question is if it was a "building in process of construction" so as to make it insured despite the fact that it was vacant and unoccupied.
In the first place, we do not accept the distinction Phoenix seeks to make between "construction" in the policy and the process which was going on with respect to this house at the time of the loss. We cannot accept the proposition that unless the building was constructed from the beginning and this process was still going on at the time of the loss the policy provision does not apply. This house was moved a considerable distance before it was placed on the foundations prepared for it on Lot 22. When it arrived at its new location it seems that it was a virtual shell. The walls on the inside were to be completely refinished with sheetrock or plaster, all of the utilities were to be installed, a septic tank was to be *671 constructed, and other major steps were to be taken before it was ready for occupancy. While it is true that plaintiff had something with which to start when the house was placed on Lot 22 as opposed to construction from the beginning, we cannot say that a reasonable interpretation of construction would exclude the process of reconstruction of this particular house.
The uncontradicted testimony of plaintiff was that the house was not yet ready for occupancy at the time of this loss. Phoenix introduced evidence to show concern on its part about the fact that the property was vacant and unoccupied as of July, 1967, but plaintiff produced two witnesses who testified that some of the repairs were made within thirty days prior to the loss. This was the crucial period for a determination of coverage or not under the policy provisions. The policy places no time limit on how long construction may take so as to call into effect the vacancy or occupied provisions of the policy. The problem as to how long or to what extent a building's construction must progress before the exclusion comes into play, as well as the problem of the meaning of the word "construction," are ambiguous areas in the policy which must be construed against the insurer.
Finally, in contesting liability, Phoenix contends that Plaintiff did not have any insurable interest in the house because of the property in question being titled in the name of the partnership. The problem is not susceptible to an easy solution and requires that C.C. Art. 508 be considered more closely and the facts more carefully scrutinized. The article reads as follows:
"When plantations, constructions and works have been made by a third person, and with such person's own materials, the owner of the soil has a right to keep them or to compel this person to take away or demolish the same.
"If the owner requires the demolition of such works, they shall be demolished at the expense of the person who erected them, without any compensation; such person may even be sentenced to pay damages, if the case require it, for the prejudice which the owner of the soil may have sustained.
"If the owner keeps the works, he owes to the owner of the materials nothing but the reimbursement of their value and of the price of workmanship, without any regard to the greater or less value which the soil may have acquired thereby.
"Nevertheless, if the plantations, edifices or works have been made by a third person evicted, but not sentenced to make restitution of the fruits, because such person possessed bona fide, the owner shall not have a right to demand the demolition of the works, plantations or edifices, but he shall have his choice either to reimburse the value of the materials and the price of workmanship, or to reimburse a sum equal to the enhanced value of the soil."
The evidence shows that plaintiff was in good faith in placing the house on the property in January, 1967, and reconstructing it until August of 1968. There is no evidence in this record to show that plaintiff's brothers took any action against him because of his placing the house there initially. While it is true that they were dissatisfied with the appearance of the house the fact remains that they did nothing about it. Only after this extended period of time did the incident take place, and from the testimony of Vincent it is clear that it was more a question of revenge for a general attitude on plaintiff's part rather than the appearance of the house. Nothing in Vincent's testimony suggests that he was demolishing the house because plaintiff had no legal right to use the lot. The record shows that Lot 22 was eventually to be allocated by title to plaintiff, just as other lots in the subdivision were to be allocated to the other two brothers. The fact that the act of exchange or partition had not yet been passed prevented plaintiff from taking legal title but demonstrates that he was in good faith when he placed the house on the lot.
From the foregoing, it follows that plaintiff had an insurable interest in the house *672 since he was in good faith when he placed the house on the lot based upon the last paragraph of Art. 508. The same result was reached in Rigdon v. Marquette Casualty Co., 163 So.2d 442 (La.App. 2nd Cir. 1964), writ refused.
Plaintiff's claim for the policy limits is based upon the testimony of a contractor, Charles Branch, who saw the house once in October, 1969. He testified that the house was absolutely unrepairable and should be demolished and a new house rebuilt at a cost of over $14,000. He had the background sufficient to qualify him as an expert. But, the cornerstone of his conclusion was his opinion that the house could not be shored up and put back on the foundation. When asked why this wasn't possible, the answer was "I just don't think you could do it in the condition it's in."
His testimony was in total conflict with Vincent Brouillette's expert, Sherman A. Bernard, who had been in the house moving and shoring business for nineteen years and qualified as an expert in this field. He saw no problem about shoring up the house and moving it back onto the foundations, and submitted a bid to do just that for $772. He testified that most of the floor joists were intact as well as the roof rafters and those which required replacing could be for a specific price. Bernard explained exactly how he proposed to accomplish the shoring. He mentioned some of the hazards that were involved and after extensive examination and cross-examination stuck to his conclusion that the house could indeed be shored and moved. When his testimony is compared to the arbitrary statement by Branch that he simply didn't think it could be done, it becomes more probable than not that Branch's supposition was erroneous. Because Branch started with that supposition he itemized no specific amounts to repair the house, but defendant, Vincent Brouillette, produced his own testimony consisting of an itemization of exactly what would be necessary to repair the house after it was moved by Bernard under his bid which came to a total figure of $1993.
We recognize that Vincent's testimony must be considered as self-serving and viewed with some suspicion. But it is uncontradicted, and apparently prepared at the suggestion of Vincent's attorney in connection with an offer to compromise the case by making such repairs. Finally, while the amount of the estimate seems low it must be considered in the light of the only hard figures produced by plaintiff for his work on the house in the first instance which totaled only about $600 plus his own labor. Plaintiff had the burden of proof on the amount of the loss and failed to show that the repairs would exceed the $1993 figure established by Vincent Brouillette. Therefore, plaintiff is entitled to recover that amount against Phoenix.

PLAINTIFF'S CLAIM AGAINST VINCENT BROUILLETTE
We reject the reasoning of the trial court that plaintiff is relegated to a claim in the settlement of partnership affairs. He was a victim of a tort and he is entitled to compensation under C.C. Art. 2315. According to plaintiff's testimony, the house had reached the stage where only four or five days of work would put it in condition where it could be rented for $90 per month. We are not favored with the amount of time it might take for the repairs proposed by Vincent Brouillette to be completed, but it does not appear that this work would exceed two months, so that plaintiff is entitled to $180 for lost rent. However, plaintiff is neither entitled to exemplary damages as he prayed for, Holcombe v. Superior Oil Co., 213 La. 684, 35 So.2d 457 (1948), nor other compensatory damages since he did not pray for or prove such. Phoenix is also entitled to recovery from Vincent on its intervention.
Accordingly, the judgment appealed from is reversed and set aside and there is judgment in favor of plaintiff, Ranton Brouillette and against defendants, Vincent Brouillette and Phoenix Insurance Company of New York, for the sum of $1993 with legal interest from date of judicial demand (April 19, 1969) until paid, and for all costs.
*673 There is judgment in favor of Phoenix Insurance Company of New York and against Vincent Brouillette on the intervention for any amount Phoenix pays to Ranton Brouillette under his judgment.
There is judgment in favor of Ranton Brouillette against Vincent Brouillette for the additional amount of $180 with legal interest from date of judicial demand (August 21, 1969) until paid, and for all costs.
REVERSED AND RENDERED.