Filed 10/7/20  Zenith Ins. v. Liberty Mutual Fire Ins. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| ZENITH INSURANCE COMPANY, | B301659 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC505477) |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gregory Keosian, Judge.  Affirmed.

Valle Makoff, Jeffrey B. Valle, Susan L. Klein, and Steven M. Ragona for Plaintiff and Appellant.

Lindahl Beck and Kelley K. Beck for Defendant and Respondent.

This is the second appeal from an insurance coverage action involving a workers' compensation insurance policy issued by Liberty Mutual Fire Insurance Company (Liberty). In the previous appeal, we reversed the judgment entered against Liberty and in favor of Zenith Insurance Company (Zenith) because the trial court erroneously submitted to the jury the legal determination of coverage under the Liberty policy. (*Zenith Insurance Company v. Liberty Mutual Fire Insurance Company* (Aug. 29, 2018, B284295) [nonpub. opn.] (*Zenith I*).) We remanded the matter for the trial court to determine Liberty's obligations under the policy.

On remand, the trial court ruled that the Liberty policy did not provide coverage for a workers' compensation claim Zenith paid, under a reservation of rights, to FFC, Inc. (FFC). Zenith appeals from the judgment entered upon that ruling.

We affirm the judgment.

## BACKGROUND

### Factual background[1]

#### *Shea Homes SHPIP*

Liberty has issued workers' compensation and general liability insurance policies to Shea Homes (Shea) since 2010. Shea, a residential real estate developer, maintains an owner-controlled insurance program called the Shea Homes Partnership Insurance Program (SHPIP). Under the SHPIP, Shea purchases workers' compensation insurance coverage for contractors enrolled in the program. Enrollment in the SHPIP is mandatory for all contractors working at Shea projects.

_____

[1] Much of the factual background concerning this dispute is set forth in our opinion in the previous appeal, *Zenith I*. We reiterate the pertinent facts as necessary.

Shea's third party SHPIP administrator, Orion Risk Management (Orion), processes contractor enrollments, provides enrollment information to Liberty, and obtains contractor payroll reports that are the basis for SHPIP premium payments. After Orion provides enrollment information to Liberty, Liberty processes the enrollment and issues to the enrolled contractor a Liberty policy providing SHPIP coverage. Once enrolled, a contractor is placed on an Excel spreadsheet of approved Shea trade partners. An enrolled contractor has its Liberty policy automatically renewed for each policy year thereafter in which it remains on the approved trade partner spreadsheet and in which it has a current construction contract with Shea.

### *Falcon Framing and FFC*

Falcon Framing Company, Inc. (Falcon) was an approved Shea trade partner and had been continuously enrolled in the SHPIP since at least 2009. On March 1, 2012, Falcon and Shea entered into a construction contract for the Shea Seaside project in Encinitas, California.

On April 5, 2012, Falcon's sole officers and shareholders, Lester Phipps and Terry Morgan, formed a new corporate entity named FFC, Inc. (FFC). FFC's sole shareholders and officers were Phipps and Morgan, and it conducted the same business, at the same office, with the same customers, suppliers, and equipment as Falcon. FFC acquired Falcon's assets for no consideration and Falcon was dissolved on August 13, 2012.

Morgan and Phipps did not notify Shea, Orion, or Liberty that they had dissolved Falcon and were continuing their business operations through FFC until August 20, 2012, when an FFC employee suffered catastrophic injuries while working at the Shea Seaside project.

### Liberty policy

Liberty issued a workers' compensation and employers liability insurance policy, with a policy period from 8/1/2012 to 8/1/2013 to Falcon as the named insured (the Liberty policy). The Liberty policy was a renewal of a previous policy Liberty had issued to Falcon for the period 8/1/2011 to 8/1/2012.

The Liberty policy includes an Unintentional Errors and Omissions Endorsement that states in part:

> "It is agreed that in the event of your unintentional failure to disclose all hazards, prior occurrences or factual information on applications, supplements or other documents existing as of the inception date of this policy, will not prejudice the coverage provided under this policy."

### The accident

On August 20, 2012, an FFC employee named Marc Corbett (Corbett) was injured while working at the Shea Seaside project. At the time of the accident, Falcon had been paid in full for the Seaside project and had paid all of the premiums for the Liberty policy issued to Falcon. Although Falcon had been paid in full for the Seaside project, some finishing work remained to be completed, and FFC sent Corbett and other employees to the jobsite to complete that work. Corbett's first day of work for FFC was August 13, 2012, the date Falcon was dissolved. Corbett had never been employed by Falcon.

FFC tendered the worker's compensation claim for Corbett's injuries to Liberty and to Zenith, who had issued a worker's compensation policy to Falcon for work on projects other than Shea jobsites. Liberty denied coverage for the claim. Zenith

4

paid $3,239,003.86, subject to a reservation of rights, to resolve the claim.

***Procedural history***

Zenith commenced this action against Liberty for declaratory relief and equitable indemnity. The matter proceeded to a jury trial in which the jury returned a general verdict in favor of Zenith and against Liberty and that Zenith was entitled to reimbursement from Liberty in the amount of $3,230.003.86. Judgment was subsequently entered in Zenith's favor.

In the prior appeal, we reversed the judgment, concluding the trial court had erred by submitting to the jury the legal determination of whether Liberty owed coverage to FFC for Corbett's worker's compensation claim. We remanded the matter for a determination of Liberty's obligations under its policy.

On remand, the trial court ruled that the Liberty policy did not provide coverage to FFC for Corbett's injuries and that Liberty had no obligation to indemnify or reimburse Zenith for sums paid on FFC's worker's compensation claim. Judgment was entered in Liberty's favor, and this appeal followed.

## DISCUSSION

### I. Applicable law and standard of review

This appeal concerns the interpretation of an insurance policy and certain other contract documents to undisputed facts. "'The interpretation of an insurance policy as applied to undisputed facts . . . is a question of law for the [appellate] court, which is not bound by the trial court's construction.' [Citation.]" (*Bjork v. State Farm Fire & Casualty Co.* (2007) 157 Cal.App.4th 1, 6, quoting *Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 590.)

5

Interpretation of an insurance contract is governed by the general rules of contract interpretation.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)  Under these rules, the mutual intention of the parties at the time the insurance contract is formed governs interpretation, and such intent is to be inferred, if possible, solely from the written provisions of the policy. (Civ. Code, § 1636; *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27.)  The "clear and explicit" meaning of the policy provisions in their "ordinary and popular sense" controls their interpretation, unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage."  (Civ. Code, § 1644; *TRB*, at p. 27.)  The policy language must be read in the context of the instrument as a whole and a provision will be considered ambiguous when it is capable of two or more reasonable constructions.  If a policy provision is ambiguous, the ambiguity must be resolved in the insured's favor, consistent with the insured's reasonable expectations.  (*Id.* at pp. 27-28.)

## II.  The Liberty policy does not provide coverage to FFC

FFC is not an insured under the Liberty policy.  The Liberty policy identifies "Who is Insured" under the policy as follows:  "You are insured if you are an employer named in Item 1 of the Information Page.  If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees."  The only entity listed in item 1 of the Liberty policy Information Page is "Falcon Framing Company, Inc."  FFC is not named as an insured under the policy.

The Liberty policy's coverage provision states that "[w]e will pay promptly when due the benefits required of you [the

6

insured employer, Falcon] by the workers' compensation law." The plain language of the policy extends coverage only to Falcon, and not to FFC.

Zenith provides no legal support for its contention that the successor corporation of a named insured employer in a worker's compensation policy acquires the named insured's rights under the policy.

The Unintentional Errors and Omissions Endorsement to the Liberty policy does not extend coverage to FFC. That endorsement states:

> "It is agreed that in the event of your unintentional failure to disclose all hazards, prior occurrences or factual information on applications, supplements or other documents existing as of the inception date of this policy will not prejudice the coverage provided under this policy."

The language of the endorsement is clear and unambiguous. It states that Falcon, the insured, will not have its coverage under the policy prejudiced by its inadvertent failure to disclose hazards or factual information in applications or other documents existing as of the date of the policy's inception, August 1, 2012. Falcon's failure to notify Liberty of its dissolution and the formation of FFC after the date of the policy's inception did not extend coverage to FFC. The plain language of the Liberty policy does not provide coverage to FFC.

## III. The Shea contract documents do not make FFC an insured

Section 13.5 of the Shea Master Agreement does not support Zenith's argument that FFC, as Falcon's successor, assumed all of Falcon's rights and obligations under the Shea

7

contract documents, including the right to coverage under the SHPIP. Section 13.5 of the Master Agreement states:

> "13.5 No Assignment by Contractor. Contractor may not assign, by operation of law or otherwise, any of its rights and obligations under the Contract Documents without Builder's prior written consent, which may be granted or withheld in Builder's sole discretion. The making of any assignment by Contractor, or any consent to it by Builder, will in no event relieve Contractor, or its surety, of any of its obligations under the Contract Documents. This Section 13.5 does not apply to the subcontracting by Contractor of a portion of the Work, under the Contract Documents. Subject to the above, the Contract Documents are binding upon and will inure to the benefit of the successors and permitted assigns of the parties."

It is undisputed that Falcon did not obtain Shea's approval to assign its rights and obligations under the Shea contract documents to FFC. Even if FFC is considered Falcon's successor, rather than its assignee under the Master Agreement, FFC did not thereby become an insured under the Liberty policy. Liberty is not a party to the Master Agreement.

Section 13.5 clearly and unambiguously states that FFC is entitled to assume only Falcon's rights and obligations under the "Contract Documents," defined in section 2 of the Master Agreement as the construction contract between Falcon and Shea, specifications and reports set forth in the construction contract, applicable regulations, Shea safety and quality

requirements, and the Master Agreement itself.[2]  Neither the Shea SHPIP Manual nor the Liberty policy is included in the definition of  "Contract Documents."  FFC, even if considered Falcon's successor under section 13.5 of the Master Agreement, did not thereby become an insured under the Liberty policy.

The insurance provisions of the Master Agreement did not obligate Liberty to provide insurance coverage to FFC.  As discussed, Liberty is not a party to the Master Agreement and is not bound by its provisions.  (*EEOC v. Waffle House, Inc.* (2002) 534 U.S. 279, 294 ["[i]t goes without saying that a contract cannot bind a nonparty"]; *Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1724 [nonparty to insurance contract cannot state cause of action for breach of insurer's contractually based duty].)

Notwithstanding Zenith's argument to the contrary, the Master Agreement did not give FFC an automatic right to SHPIP participation.  Rather, the Master Agreement expressly states that "SHPIP . . . will not cover suppliers and subcontractors that have not been provided a certificate of insurance.  Contractors, subcontractors, and suppliers who do not have a certificate of

---

[2]     The term "Contract Documents" is defined in the Master Agreement as follows:  "'Contract Documents' means the Master Agreement, the Contract Plans, Specifications, and other reports set forth in the Contract, Title 24 requirements, Title 7 Documents, Shea Standard Quality Requirements, Shea Standard Safety Requirements and other documents specified in Schedule B attached to the Contract, and all subsequent Change Orders, CORs and LMAs."  "Contract" is defined in section 1.1 of the Master Agreement as "any specific Construction Contract . . . entered into between [Shea] and Contractor."

9

insurance must secure and maintain, at their own cost, the insurance coverage specified in the Contract." The Master Agreement further states that "[i]n the event Contractor's Work is not enrolled in SHPIP, or any other wrap-up insurance program, Contractor must secure and maintain, at its own cost," specified limits of worker's compensation and employer's liability insurance. Nothing in the Master Agreement provides automatic SHPIP enrollment for persons or entities who acquire the assets of a previously enrolled contractor.

## IV. Zenith's cited cases do not support coverage

*University of Judaism v. Transamerica Ins. Co.* (1976) 61 Cal.App.3d 937 (*University of Judaism*) and *California Compensation & Fire Co. v. Industrial Acci. Com.* (1965) 62 Cal.2d 532 (*California Compensation*), on which Zenith relies, are inapposite and do not support its coverage arguments.

*University of Judaism* involved the insureds' express assignment of a fire insurance policy to the plaintiff, along with the transfer of the insured property. The insureds did not obtain the insurer's consent to assign the policy. Soon after the transfer, the property was destroyed by fire. Both before and after the property transfer, and until its destruction by fire, the property was leased to the same tenant, who conducted the same business operations on the property. The insurer denied coverage based on a policy provision that stated: "'Assignment of this policy shall not be valid except with the written consent of [the insurer].'" (*University of Judaism, supra*, 61 Cal.App.3d at pp. 939-940.) The appellate court reversed the judgment entered in the insurer's favor, interpreting the assignment provision of the policy, noting that "Forfeitures on technical grounds which bear

10

no substantial relationship to the insurer's risk are disfavored." (*Id*. at p. 941.)

The plaintiff in *University of Judaism* had an express assignment of the policy before the fire occurred, and the appellate court ruled that the insurer could not invoke the assignment clause to deny coverage. Here, the Liberty policy's assignment provision is not at issue. There was no assignment of the Liberty policy and no forfeiture based on technical grounds.

*California Compensation* is equally inapposite. That case involved interpretation of an ambiguous exclusion in a workers' compensation policy issued to "'Richard Jones, Edward Mello and Wesley Johnson, joint and not severally d.b.a. South Bay Insulation Company.'" Under a special endorsement the benefits of the policy were made applicable to Jones, Mello, and Johnson. After the policy was issued, Joseph Ambriz, without the knowledge of the insurer, became a member of the insured partnership. A dispute among the partners arose, and Johnson shot and killed Jones and Mello in the partnership office. The insurer sought to deny coverage based on an exclusion that stated in relevant part: "'It is Agreed that, anything in this Policy to the contrary notwithstanding, this Policy Does Not Insure: Any liability which the named Employer may have arising out of operations conducted jointly by said named Employer with any other person, firm or corporation. . . .'" (*California Compensation, supra*, 62 Cal.2d at pp. 533-534.) The insurer argued that this exclusion barred coverage because the liability arose out of operations conducted by the partnership jointly with Ambriz. The court in *California Compensation* rejected the insurer's argument and found the exclusion to be ambiguous but

11

inapplicable to situations involving the addition of a partner. (*Id.* at pp. 534-535.)

This case does not involve the addition of a partner or the application of an ambiguous policy exclusion. The principles set forth in *California Compensation* do not apply.

**V.  Public policy does not compel coverage**

We are unpersuaded by Zenith's arguments that public policy supports a finding that the Liberty policy covered FFC's claim for Corbett's injuries. The cases cited by Zenith do not support such a finding.

*Graham v. Workers' Comp. Appeals Bd.* (1989) 210 Cal.App.3d 499 involved issues of statutory construction, specifically, whether Civil Code section 3333.1, which abrogated the collateral source rule in medical malpractice actions, prevented an employer from obtaining credit against future benefits it owed to the injured employee under certain credit provisions of the Labor Code. (*Graham*, at pp. 504-505.) That case did not involve  any public policy considerations concerning the interpretation of a workers' compensation policy.

*Catholic Healthcare West v. California Ins. Guarantee Assn.* (2009) 178 Cal.App.4th 15 also involved an issue of statutory construction, not the interpretation of an insurance policy. (*Id.* at p. 31.)  No such issue is presented here.

The trial court did not err by concluding the Liberty policy did not provide coverage to FFC.

## DISPOSITION

The judgment is affirmed.  Liberty shall recover its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT